Dennis DEAVER, Appellant,

v.

The AUCTION BLOCK COMPANY, Appellee.

No. S–10724.

Supreme Court of Alaska.

Feb. 25, 2005.

Rehearing Denied April 22, 2005.

---

**21.** *Id.*

**22.** *See* RESTATEMENT (SECOND) OF JUDGMENTS §§ 84(3)(b); 83(2)(a-e).

Shane C. Carew, Shane Carew, P.S., Seattle, Washington, for Appellant.

Steven J. Shamburek, Law Office of Steven J. Shamburek, Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Dennis Deaver delivered his halibut catch to the Auction Block Company, which issued him an Auction Block fish ticket. Auction Block ultimately paid Deaver less for some of the halibut than the price specified on the fish ticket. Deaver sued Auction Block for the specified price, claiming it was the "buyer" of his fish. Following trial, the superior court found that the parties had agreed Auction Block was an auctioneer, not a buyer. Because it is undisputed that Auction Block gave Deaver an Auction Block fish ticket, we hold that Auction Block was the "primary fish buyer" of Deaver's halibut, within the meaning of AS 44.25.040(a). If the buyer does not fully pay a fisher who delivers fish to the buyer, the fisher can proceed against the buyer and, per AS 44.25.040(e), the buyer's surety bond. Further, Auction Block must be considered a merchant buyer within the meaning of Deaver's claim under the Uniform Commercial Code. We therefore reverse and remand.

## II. FACTS AND PROCEEDINGS

Dennis Deaver is a commercial fisher and owner of a fishing vessel, the F/V PACIFIC SUN.[1] He fishes commercially in the waters off the State of Alaska.

The Auction Block Company is an Alaska corporation that conducts online auctions of fish and provides other services to fishers and fish buyers. Auction Block is bonded and licensed in Alaska as a "primary fish buyer." Between May 1999 and May 2001, it was the principal on a $10,000 surety bond issued by the Continental Casualty Company to Auction Block conditioned upon Auction Block paying commercial fishers "for the price of raw fishery resource purchased from them."

Deaver and Auction Block engaged in two transactions relevant here. The dispute before us arises out of the second transaction. In the first transaction, Deaver took a load of

1. We describe these mostly undisputed facts to provide a context for the narrow legal issue of this appeal. We do not intend to preclude the parties from litigating genuine material factual disputes on remand.

fish to Seward on September 28, 1999 and sought to engage Auction Block's services. Deaver and Kevin Hogan, president of Auction Block, met in Seward that evening to discuss Deaver's participation in an online auction of his fish. Hogan explained that if three qualified bidders submitted bids, Deaver would be committed to selling his fish to the highest bidder. Hogan also explained that the bidders would be able to specify sale conditions, such as a condition allowing the bidder to inspect the fish for quality and to reduce the price for "number two" quality fish. Deaver then hired Auction Block to auction his fish.

The next morning, Deaver and Hogan watched the online auction of Deaver's fish from Auction Block's Seward office. Icicle Seafoods submitted the highest bid, conditioned on Icicle grading the fish for quality and paying twenty percent less for "number two" quality fish.

Deaver delivered the fish directly to Icicle in Seward, where Icicle graded their quality. After receiving the fish, Icicle issued Deaver an Alaska Department of Fish and Game (ADF & G) fish ticket. The fish ticket identified Icicle as the "Company." The "Fish Received by" line on the ticket bore the signature of Larry S. Dalberg. The attached catch receipt identified Dalberg as the "Reg. Buyer Representative."

Icicle graded some of the halibut as "number two" quality and consequently reduced the purchase price for those fish. Although Icicle's bid had specified that Icicle would pay twenty percent less for "number two" quality fish, Icicle and Deaver negotiated a modified price reduction of ten percent.

The fish ticket Icicle issued to Deaver described the species (halibut) and specified by size the prices per pound and the number of pounds of fish Deaver had delivered to Icicle. It also listed the number of pounds of "number two" quality fish delivered and the reduced price per pound for those fish. It stated the total weight delivered and the total price Icicle agreed to pay Deaver for the halibut. Deaver paid Auction Block a one percent commission for the transaction. There is no dispute that Icicle was the "primary fish buyer" of this load of halibut and that Auction Block was not.

The second transaction differed somewhat. Deaver notified Auction Block in early October 1999 that he wanted to market a load of halibut and sablefish (black cod) through Auction Block. Auction Block conducted an online auction of these fish; Seafood Products, of Vancouver, British Columbia, was the high bidder, offering to pay $2.60 per pound for the halibut. Its bid also specified that Seafood Products would inspect the halibut at its plant and that it would pay fifteen percent less for "number two" quality halibut. Snug Harbor Seafoods, a buyer in Kenai, ultimately purchased the black cod.

Deaver landed his halibut in Seward on October 5 and Auction Block offloaded the fish from Deaver's boat. Auction Block issued Deaver ADF & G Halibut/Sablefish Ticket P99008307. The fish ticket listed Auction Block as the "Company." Auction Block does not dispute that the fish ticket "states that Auction Block is the buyer" of the halibut, although it does not concede that it actually *was* the buyer of the fish. The parties stipulated in the superior court that: "The Alaska Department of Fish & Game Halibut/Sablefish Ticket states that the Auction Block Company is the buyer. The Auction Block issued the fish tickets for the second sale discussed above. The Auction Block is listed as the registered buyer on the IFQ/CDQ Shipping Reports."

The "fish received by" line on the fish ticket bears the signature of Molly J. O'Leary, an Auction Block employee. The attached catch receipt identified O'Leary as the "Reg. Buyer Representative." The fish ticket specifies the number of pounds of halibut delivered and the price per pound, $2.60, but does not mention any reduction for "number two" quality fish, and does not state a total price for the fish. Auction Block arranged to have the halibut trucked to Seafood Products in Vancouver.

Seafood Products paid for the shipping and inspected and graded the fish when they were delivered in Vancouver some days later. It decided that many of the fish that had been stored in refrigerated sea water (RSW) were of lesser quality, requiring downgrade to number two quality; it therefore paid $2.21 per pound for the RSW portion of the

halibut, a fifteen percent reduction from the $2.60 specified on the fish ticket delivered to Deaver. The reduction was consistent with the terms of Seafood Products's bid. Seafood Products wired the purchase money to Auction Block, which wrote two checks to Deaver. Some weeks passed between Deaver's delivery of the fish to Auction Block and his receipt of payment from Auction Block, because Auction Block did not pay Deaver until Seafood Products paid Auction Block. Auction Block paid Deaver the total amount bid by Seafood Products, as reduced by Seafood Products by fifteen percent for the RSW halibut graded number two quality, and further reduced by Auction Block's commission.

Deaver sued Auction Block to recover the difference between the price listed on the fish ticket Auction Block issued to Deaver on October 5, 1999 when he delivered the halibut to Auction Block and the price Seafood Products paid for the fish. His complaint concerned the reduction from $2.60 per pound to $2.21 per pound for the 19,000 pounds of RSW fish Deaver delivered on October 5. Auction Block responded that it was only the "nominal 'buyer,' " and that Deaver should have sued Seafood Products, which was, according to Auction Block, the real buyer.

The superior court conducted a one-day trial. After listening to testimony and reviewing the documentary evidence, the court found with respect to the second transaction that Deaver knew he contracted with Auction Block to auction his fish to the highest bidder. Finding that Auction Block fulfilled its bargain, the court dismissed Deaver's claim against Auction Block. The court reasoned that "the logical flaw" in Deaver's argument was that "the statute [AS 44.25.040] does not provide (nor can it be implied) that only buyers can issue fish tickets. The statute does not establish that [Auction Block] was a buyer." The court also reasoned that the "issuance of the fish ticket is merely some evidence" to be considered in determining the parties' contract. Based on all the evidence, the court rejected Deaver's claim that Auction Block was the buyer of the halibut.

The court entered final judgment dismissing Deaver's complaint and awarding Auction Block attorney's fees and costs against Deaver.

Deaver appeals the dismissal of his claims against Auction Block. He also appeals the award of attorney's fees to Auction Block.

## III. DISCUSSION

### A. Standard of Review

■■■■ On appeal, we review a trial court's factual findings for clear error and its legal rulings de novo.[2] We apply our independent judgment to questions of statutory interpretation and adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[3] Because the facts relevant to the narrow issue before us are undisputed and because Deaver's appeal turns on the meaning and effect of a statute and regulation, we apply our independent judgment.

### B. Auction Block's Role in the October 5 Transaction

On appeal, Deaver advances numerous factual and legal arguments to support his contention that it was error to dismiss his action against Auction Block: (1) the halibut were number one quality when he delivered them to Auction Block; (2) as a matter of fact, the transaction between Deaver and Auction Block was not an auction; (3) as a matter of law, only a buyer may issue fish tickets; (4) as a matter of law, when a fisher receives a fish ticket, the company listed on the fish ticket is the buyer; (5) when a company issues a fish ticket to a fisher and invoices a third party for the price, the company issuing the fish ticket is the buyer; (6) a company that is licensed and bonded by the state to buy fish is a merchant under the Uniform Commercial Code (UCC); and (7) unless there is an effective rejection, a merchant buyer under the UCC must pay according to the terms of the fish ticket.

■■■■ Some of these contentions present legal or factual disputes that were not expressly resolved below. The superior court's finding that Auction Block was an auctioneer and not a buyer rendered it unnecessary to de-

**2.** *Skaflestad v. Huna Totem Corp.,* 76 P.3d 391, 395 (Alaska 2003).

**3.** *In re Life Ins. Co. of Alaska,* 76 P.3d 366, 368 (Alaska 2003).

cide some of the issues Deaver raises here. We think that a single narrow legal issue controls this appeal: does the undisputed fact that Auction Block issued Deaver an Auction Block fish ticket when Deaver delivered his halibut to Auction Block make Auction Block the primary fish buyer of Deaver's fish? If so, it was error to dismiss Deaver's action against Auction Block.

As Auction Block recognized in its superior court brief, the commercial fishing industry in Alaska is highly regulated.[4] This extensive regulation reflects the state's strong interest in the management of a renewable resource.[5] But it also reflects a state social policy of protecting commercial fishers. Thus, AS 44.25.040(a) requires a "primary fish buyer" to post a surety bond for the express purpose of securing payment to fishers for the raw fish they deliver.[6] According

to its title, AS 44.25.040 is intended to provide "[s]ecurity for collection of wages and payment for raw fish."[7] The statute was originally enacted in 1977 and codified as AS 16.10.290, as part of an act "relating to security for the collection of wages and payment for raw fish."[8] In 1993 the governor, by Executive Order No. 85, transferred from the Department of Labor to the Department of Revenue administration of "the bonding program that serves as security for the collection of wages and payment for raw fish."[9] Alaska Statute 16.10.290 then became AS 44.25.040.[10]

Alaska Statute 44.25.040 requires a primary fish buyer to file a surety bond running to the state conditioned upon the promise to pay "independent registered commercial fisher[s] for the price of the raw fishery resource purchased from them...."[11] The primary

---

4. *State v. Dutch Harbor Seafoods, Ltd.*, 965 P.2d 738, 742 (Alaska 1998) (evaluating strict liability commercial fishing regulations "in the context of the highly regulated multi-million dollar fishing industry"); *State v. Lawler*, 919 P.2d 1364, 1366 (Alaska App.1996) (calling commercial fishing "a licensed and heavily regulated commercial activity" and holding that participants in this activity can properly be held to higher standard of compliance than might be appropriate for ordinary citizens); *Cole v. State*, 828 P.2d 175, 178 (Alaska App.1992) (stating that commercial fishing qualifies as "heavily regulated industry"); *see also McNabb v. State*, 860 P.2d 1294, 1298 (Alaska App.1993) (noting that court had "upheld the application of large fines in commercial fishing cases" and that "fines reflect the heavily regulated nature of the industry, the large profits which can occur from illegal fishing, and the value of the resource to the citizens of the state").

5. We have noted that in conformity with article VIII, section 2 of the Alaska Constitution, the legislature created the Board of Fisheries for purposes of the conservation and development of the fishery resources of the state. *Interior Alaska Airboat Ass'n v. State, Bd. of Game*, 18 P.3d 686, 690–91 (Alaska 2001) (citing *Alaska Fish Spotters Ass'n v. State, Dep't of Fish & Game*, 838 P.2d 798, 800 (Alaska 1992)); *see also Nathanson v. State*, 554 P.2d 456, 458 (Alaska 1976). The court in *Nathanson* noted that Alaska's fisheries are unquestionably an important resource of this state and, further, that to insure the viability of this resource and the welfare of those dependent upon it, the state has broad powers in the regulation of fisheries. *Id.* at 458.

6. AS 44.25.040(a) provides in part:
    A person applying for a license as a fish processor or primary fish buyer shall file with the commissioner of revenue a surety bond run-

ning to the State of Alaska conditioned upon the promise to pay ... (2) independent registered commercial fishermen for the price of the raw fishery resource purchased from them....

7. A fiscal note attached to House Bill 350 before its enactment as chapter 102, SLA 1977, described the bill's purposes in these terms:

    This bill will provide needed protection to persons furnishing labor in the business of fish processor or buyers, particularly those enterprises that are not domestic in the state, claims against the latter are difficult if not impossible to collect or require considerable time to resolve, creating a financial hardship to a claimant.

8. Ch. 102, § 2, SLA 1977.

9. Executive Order No. 85 § 1 (1993).

10. *Id.* at §§ 3–4.

11. AS 44.25.040(a) provides:

    A person applying for a license as a fish processor or primary fish buyer shall file with the commissioner of revenue a surety bond running to the State of Alaska conditioned upon the promise to pay (1) all persons furnishing labor to a fish processor or primary fish buyer, including contractual employee benefits; (2) independent registered commercial fishermen for the price of the raw fishery resource purchased from them; and (3) unemployment insurance contributions. If the surety bond is insufficient to satisfy all obligations under this subsection, the obligations to persons furnishing labor and to independent registered com-

fish buyer must post this surety bond unless the buyer has more than the amount of the bond in lienable property within the state.[12] The statute defines "primary fish buyer" to mean a person "engaging ... in the business of originally purchasing or buying any fishery resource...." [13]

The legislature amended the statute in 1989 to extend the coverage of the bond to unemployment insurance contributions,[14] but in doing so gave priority to claims of persons furnishing labor and to claims of "independent registered commercial fishermen." [15]

Alaska Statute 44.25.041 exempts specified purchasers and entities. Buyers that do not actually purchase fish or hire employees do not have to post a bond, nor do restaurants, grocery stores, and established fish markets.[16] There is no statutory exemption for auctioneers who are primary fish buyers.[17]

We read AS 44.25.040 to require a person or firm acting as a "primary fish buyer" to be licensed and to post the specified bond. We also read it as treating the surety bond of the primary fish buyer as security for fulfilling the purchase terms promised to the fisher. It therefore implicitly gives the fisher a claim against the buyer of the fish if the fisher is not fully paid.

Also relevant to our inquiry are the state regulations imposing duties on fishers delivering raw fish to processors or buyers and on the persons to whom raw fish are delivered.[18] Per 5 AAC 39.130, when a fisher delivers a load of fish to a buyer not licensed to process fish, the buyer issues a fish ticket.[19] The fish ticket must be imprinted with a permit number and must include the buyer's name.[20] Only a buyer who has posted the required surety bond may obtain these fish tickets from the state; only then can it act as a buyer.[21] The fish ticket regulation, 5 AAC 39.130, states that a person who is the first purchaser of raw fish may operate only after receiving authorization and fish tickets from the department.[22] The regulation also provides that "forms will not be processed and fish tickets will not be issued without certification that surety bonds as required by [AS 44.25.040] have been posted...." [23] Thus, the statutes and regulations require a primary fish buyer to post the statutory bond before the buyer can issue fish tickets and operate as a buyer.[24]

Was Auction Block the primary fish buyer in the October 5 transaction? Auction Block argues that it, per its agreement with Deaver, was merely the auctioneer and not the

---

mercial fishermen shall be paid before unemployment insurance contributions are paid. The surety or sureties must be satisfactory, in the determination of the commissioner.

**12.** AS 44.25.040(c) ("A bond is not required if the fish processor or primary fish buyer has more than the amount of the bond in lienable property in the state and provides proof of the property satisfactory to the commissioner.").

**13.** AS 44.25.048(6).

**14.** Ch. 100, § 1, SLA 1989, codified as AS 16.10.290(a) (now codified as AS 44.25.040(a)).

**15.** AS 44.25.040(a).

**16.** AS 44.25.041 provides:

**Exemptions from bonding requirement.** (a) A fish processor or primary fish buyer that does not purchase fish or hire employees is exempt from the bonding requirements of AS 44.25.040.
(b) Restaurants, grocery stores, and established fish markets are exempt from the bonding requirement of AS 44.25.040.

**17.** *See* AS 44.25.041(a)-(b).

**18.** 5 AAC 39.130.

**19.** 5 AAC 39.130(c) provides in part: *"Each buyer of raw fish, each fisherman selling to a buyer not licensed to process fish* (a catcher/seller), and each person or company who catches and processes his or her own catch or that has catch processed by another person or company *shall record each landing on an ADF & G fish ticket."* (Emphasis added.)

**20.** 5 AAC 39.130(c)(1), (c)(9).

**21.** 5 AAC 39.130(a)(1).

**22.** *Id.*

**23.** *Id.*

**24.** *See State v. Tyonek Timber, Inc.,* 680 P.2d 1148, 1156 (Alaska 1984). In *Tyonek,* we stated that AS 36.25.010-.025 (Alaska's "Little Miller Act") requires primary contractors to post a payment bond to protect persons supplying labor and material; award of a contract is conditioned upon the contractor's furnishing of the bond. The requirement here is analogous; ability to buy fish is conditioned upon the buyer's furnishing of the surety bond.

buyer of Deaver's fish, and that Seafood Products was the primary fish buyer. Auction Block characterized itself below as only the "nominal 'buyer' " in the transaction. Auction Block argues that it provided services to Deaver—offloading the fish, arranging for their shipment, and processing the necessary administrative paperwork and fisheries reporting requirements—but did not buy his fish.

Auction Block points to evidence that indicates it was acting as an auctioneer; this evidence includes the submission of bids by Seafood Products and other bidders and the testimony of trial witnesses. The parties' pre-trial stipulation of "uncontested facts" also indicates that the parties intended Auction Block to act as the auctioneer. Those stipulated facts and the trial evidence would reasonably permit a fact finder to find that Auction Block and Deaver had agreed that Auction Block was Deaver's auctioneer of the halibut Deaver delivered on October 5. Indeed, the superior court did not clearly err in making that finding.

But the issue whether Auction Block was a "primary fish buyer" under AS 44.25.040 does not depend on disputed facts, for two reasons. First, Auction Block's status as an auctioneer for the October 5 halibut landing is not inconsistent with its status as the primary fish buyer for purposes of the statute and regulation. Auction Block seems to assume that a finding that it was the auctioneer must mean that its conduct in issuing Deaver an Auction Block fish ticket when he delivered the halibut to Auction Block was of no legal significance. We disagree. Treating Auction Block as the buyer to carry out statutory and regulatory purposes does not preclude Auction Block from relying on the parties' contractual intentions for other purposes. Thus, even if Auction Block, as the primary fish buyer, must satisfy the statute by paying Deaver in full for his fish, it may still invoke its contracted-for auctioneer status to defend against any claims not precluded by the statute. For example, Deaver's first amended complaint sought not only a money judgment for the difference in the

$2.60 price specified on the fish ticket and the $2.21 reduced price he received for the RSW fish, but also unspecified damages "in an amount to be proven" for Auction Block's alleged breach of the duty of good faith and fair dealing. As to that claim, it seems likely that Auction Block's contracted-for status, rather than its status as a statutory buyer, controls.

Second, even assuming the roles of auctioneer and statutory buyer in the same fish-purchase transaction are fundamentally inconsistent, it would not follow that the parties' contractual arrangement surmounts the demands of public policy. Parties cannot by private contract avoid the requirements of this kind of protective statutory and regulatory scheme or thwart its purpose.[25] The statute, by providing some protection against nonpayment or under-payment, was enacted to protect fishers who may be compelled by exigencies to enter into improvident agreements with fish buyers or to deal with buyers whose own finances may be shaky. The remedy the legislature provided would be obviated if a buyer could compel a fisher to contract away this statutory protection. Therefore, if the initial recipient of the fish is deemed the primary fish buyer, its contractual role as auctioneer cannot relieve it of its statutory duties.

It is therefore irrelevant that Deaver arguably agreed to contract terms that are inconsistent with the statute. The public policy reflected by the statute must control; to hold otherwise would leave non-parties to the contract without effective recourse. Crew entitled to shares of the catch proceeds could be harmed if unwise agreements defeat statutory protections. An owner's attempt to maximize price could leave crew members no effective recourse if the ultimate recipient of the fish were not amenable to claims in Alaska or were without assets.

Auction Block contends that its auction services are beneficial to fishers, and may help them obtain a higher price for their fish. Regardless, Auction Block may not avoid the duties imposed on it by statute and regula-

---

**25.** *See Currington v. Johnson,* 685 P.2d 73, 78 (Alaska 1984) (stating contract is void if made in violation of constitutional statute, even if statute does not contain express prohibition). *See also*

*Hoffman Constr. Co. v. United States Fabrication & Erection, Inc.,* 32 P.3d 346, 354 (Alaska 2001) (stating that AS 45.45.900 limits enforceability of indemnification clauses in private contracts).

tion, or limit the remedy the statute provides. Auction Block is effectively asking us to create an exemption the legislature did not enact.

Moreover, even assuming auctions may benefit fishers, this transaction illustrates how an auction format may harm them if a dispute arises. If the auctioneer receives the fish and issues a fish ticket, no other subsequent purchaser would be considered the primary fish buyer. Consequently, the ultimate purchaser would have no obligation to post the statutory surety bond.

Auction Block observes that Seafood Products was itself a licensed primary fish buyer and had posted its own statutory surety bond. Auction Block was nevertheless the buyer in this transaction. Seafood Products was not the primary fish buyer nor was it the initial recipient of Deaver's fish. It did not issue its own fish ticket to Deaver. Furthermore, even assuming an ultimate purchaser has posted a bond per AS 44.25.040(a), the briefing before us in this case does not establish that Seafood Products's bond would apply to a transaction in which the ultimate purchaser was not the primary fish buyer. We decline to reach that issue in this case; two of the entities potentially most interested in that issue, Seafood Products and its surety, are not parties to this appeal. Moreover, efforts of the auctioneer to determine that the successful bidder is financially responsible are not an adequate substitute for the statute's security requirement or for the state's ultimate authority to discipline firms acting as licensed primary fish buyers.

Finally, an auction arrangement potentially permits exactly the sort of transaction that led to adoption of the bond requirement in the first place: purchase of the fish by an out-of-state buyer which may resist administrative or judicial jurisdiction in Alaska, and which may not have the means to pay the fisher in full or on time.[26]

Because the surety bond statute and fish ticket regulation govern initial sales of raw fish, a factual finding that Deaver and Auction Block intended to enter into a contract for auction services does not dispose of Deaver's claim. The material facts relevant to this appeal are Deaver's delivery of the halibut to Auction Block, and Auction Block's issuance to Deaver of an Auction Block fish ticket listing the halibut Deaver delivered to Auction Block, and listing Auction Block as the buyer.

## C. Deaver's UCC Claim

▮ Deaver also argues that Auction Block was a buyer under the Uniform Commercial Code (UCC) and therefore subject to rules governing buyers. Fish are "goods" as defined by the UCC.[27] The undisputed facts also demonstrate that Auction Block held itself out as a knowledgeable dealer in fish sales. For example, Kevin Hogan, president of Auction Block, stated in his affidavit that the company is the "Home of the Cyber Fish" and "allows prospective buyers and sellers of commercially harvested fish to meet in the cyberspace marketplace." Auction Block was therefore a "merchant" for purposes of the UCC.[28] Because Auction Block was the primary fish buyer in the October 5, 1999 transaction, under the UCC it was also a buyer "who buys or contracts to buy goods."[29] It was therefore subject to UCC rules governing buyers.

The UCC provides that acceptance of goods occurs when a buyer fails to make an effective rejection, or "after a reasonable opportunity to inspect the goods, signifies to the seller that the goods are conforming or that the buyer will take or retain them in spite of their nonconformity."[30] Deaver's

---

**26.** *See supra* note 7.

**27.** AS 45.02.105(a) states that "goods" means "all things ... which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (AS 45.08) and things in action."

**28.** AS 45.02.104(a) defines "merchant" to be: a person who deals in goods of the kind or otherwise by occupation holds oneself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom this knowledge or skill may be attributed by the person's employment of an agent or broker or other intermediary who by occupation holds oneself out as having this knowledge or skill.

**29.** AS 45.02.103(a)(1).

**30.** AS 45.02.606(a)(1)-(2).

superior court affidavit stated that he confirmed with Auction Block personnel on site that the fish were in "excellent condition," and also stated that Auction Block accepted the fish for shipment to Seafood Products. Auction Block did not rebut these facts, which establish that it had the opportunity to inspect the fish and that it did not indicate to Deaver that any defects were present. Auction Block therefore "accepted" the goods within the meaning of the UCC.[31]

Acceptance imposes on Auction Block the burden of establishing any breach with respect to the accepted goods and, failing that, obligates Auction Block to pay Deaver the contract rate.[32]

Because the dismissal of Deaver's complaint was founded on a ruling that Auction Block was not the buyer and because issues of material fact may remain, we remand for consideration of Deaver's claims against Auction Block. We express no opinion about the specific merits of Deaver's claims beyond our conclusion that Auction Block must be deemed the statutory buyer of the halibut under AS 44.25.040, that Deaver may therefore proceed against Auction Block's surety bond, and that Auction Block has the status of a buyer for purposes of a claim against Auction Block under the UCC.

Deaver's Alaska Civil Rule 68 and attorney's fees arguments are mooted by our decision reversing the dismissal of Deaver's action, because the award of attorney's fees and costs to Auction Block must be vacated.

## IV. CONCLUSION

Because Auction Block issued its own fish ticket to Deaver when Deaver delivered his fish to Auction Block, we hold that Auction Block was the buyer of the fish under AS 44.25.040. We therefore REVERSE the judgment of dismissal, VACATE the award of attorney's fees and costs, and REMAND for further consideration of Deaver's claims against Auction Block.

**31.** *Id.*

**32.** AS 45.02.607(a)-(b), (d); AS 45.02.709(a)(1).