STATE of Alaska, Petitioner,

v.

John DUPIER, Rodman E. Miller, and Phillip J. Twohy III, Respondents.

No. S–11140.

Supreme Court of Alaska.

Aug. 12, 2005.

---

Jon K. Goltz, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Petitioner.

Michael Hough, Homer, for Respondents Dupier and Twohy.

Melvin M. Stephens II, Kodiak, for Respondent Miller.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

# I. INTRODUCTION

The State of Alaska charged three federally permitted fishers with landing their halibut and sablefish catches in Alaska without state permits. The fishers did not attempt to fish in state waters. The fishers argue that the Commercial Fisheries Entry Commission (CFEC) exceeded its authority when it required them to possess interim-use permits to land their catches in Alaska. They also argue that the State is preempted by federal law from requiring federal halibut and sablefish permit holders to obtain state permits to land their catches in Alaska. In addition, the fishers assert that the State's permit requirements violate certain provisions of the federal constitution. We hold that the State did not exceed its authority when it required the fishers to possess interim-use permits. We additionally conclude that federal law does not preempt the State's permit requirements, and that the permit requirements do not violate the federal constitution.

# II. FACTS AND PROCEEDINGS

## A. Facts and Trial Court Decision

The facts of this case are undisputed. Appellees John Dupier, Rodman E. Miller, and Philip J. Twohy each held Individual Fishing Quotas (IFQs) to fish in federal waters. In 2001, after fishing legally in federal waters, the fishers separately attempted to land their catches in Alaska without first obtaining state permits from the Commercial Fisheries Entry Commission (CFEC). None of the fishers attempted to fish in state waters.

The State charged the fishers with possessing commercially taken fish in state waters without having a valid interim-use permit, in violation of 20 AAC 05.110.[1]

The Alaska Legislature has authorized the CFEC to issue three types of permits. The first type, entry permits, are issued for fisheries that have been subject to limited entry because they are at risk.[2] A second type of permit, the landing permit, is designed for fishers landing their catches in Alaska.[3] The Alaska Legislature gave the commissioner of Fish and Game discretion to authorize the CFEC to issue landing permits,[4] but the commissioner had not done so prior to 2003; therefore, the CFEC had never issued a landing permit when the respondents received citations. The CFEC is also authorized to issue a third type of permit, the interim-use permit.[5] The purpose and scope of interim-use permits are the central issue in this litigation.

The court of appeals summarized the charges against Dupier, Miller, and Twohy and the trial court proceedings as follows:

> Initially, all three appellees were charged with failing to have an interim-use permit under 20 AAC 05.110(c), and the State seized the proceeds of their catches. Later, the State conceded that it could not forfeit fishing proceeds under 20 AAC 05.110(c) because a first violation of that regulation was only punishable by a fine of no more than $5,000.[1] The State then charged each appellee with an additional count of failing to have a landing permit under AS 16.05.675. Courts are required to forfeit the fish taken or retained as a result of a violation of that statute.[2]

> (b) As used in this section, a "commercial purpose" includes any sale, purchase, trade, gift, or any portion of a commercial transaction.
> (c) For purposes of this section, a person reporting a landing of fish under a federal individual fishing quota (IFQ) possesses fish for a commercial purpose.

**2.** *See* AS 16.43.225; AS 16.43.240(c).

**3.** *See* AS 16.05.675.

**4.** AS 16.05.675.

**5.** AS 16.43.210.

---

**1.** As it existed at the time of the citations, 20 Alaska Administrative Code (AAC) 05.110 (2001) stated:

> **Permit Required to Possess Fish or Shellfish.**
> (a) It is unlawful for any person to possess, within water subject to the jurisdiction of the state, any fish or shellfish, taken for a commercial purpose, aboard a fishing vessel commonly used for taking that species of fish or shellfish unless the person has in his possession a valid interim-use or entry permit card allowing him to take the fish or shellfish in his possession with the gear with which the vessel is equipped unless waived by the commission for good cause.

The appellees all filed motions to dismiss. Judge Neville granted those motions, ruling that the appellees could not be convicted under AS 16.05.675 because the CFEC had never issued landing permits and the appellees could not get them. Judge Neville also found that the appellees could not be convicted under 20 AAC 05.110(c) because that regulation was invalid. Judge Neville gave several reasons for this conclusion: (1) the legislature had intended fishers landing fish caught in federal waters to get landing permits, not interim-use permits; (2) 20 AAC 05.110(c) was inconsistent with the legislative purpose behind interim-use permits, which were intended to authorize fishers to operate specific gear in specific fisheries managed by the state; and (3) by requiring fishers harvesting fish in federal waters to hold permits that had been designed for fishers operating in state fisheries, the CFEC had created unintended conflicts with federal law.[6]

---

1. AS 16.43.970(a).
2. AS 16.05.723.

## B. Court of Appeals Decision

The court of appeals affirmed the trial court's dismissal of the charges.[7] The court of appeals concluded that the CFEC is only authorized to issue interim-use permits to persons fishing in areas that are potentially subject to limited entry by the CFEC. Therefore, the court of appeals determined that the CFEC had no authority to require

6. *State v. Dupier,* 74 P.3d 922, 927–28 (Alaska App.2003).

7. *Id.* at 923.

8. As it existed in 2001, AS 16.05.675 stated:
 **Landing permits.**
 (a) A person who does not hold a limited entry permit or interim-use permit issued under AS 16.43 may not deliver or land fish in the state unless the person
 (1) holds a valid federal permit to operate commercial fishing gear in the fishery conservation zone; and
 (2) has been issued a landing permit by the Commercial Fisheries Entry Commission.
 (b) The commissioner may by regulation establish eligibility requirements for the issuance of a landing permit.

fishers in federal waters to hold interim-use permits to land their catches in Alaska and concluded that 20 AAC 05.110(c) was an invalid regulation.

The court of appeals also affirmed the dismissal of the charges brought by the State under AS 16.05.675,[8] concluding that AS 16.05.675 does not require fishers to have interim-use or entry permits, but instead directs fishers without interim-use or entry permits to obtain landing permits.

Finally, the court of appeals applied the same analysis to the charge against Twohy for landing sablefish as that applied to the charges against all three respondents for landing halibut. The court upheld the district court's dismissal of all of the charges against all of the respondents.

## C. Amendments to AS 16.43.210(a) and 20 AAC 05.110

The scope of the CFEC's authority to require permits within state waters turns on the language in the Alaska statutes governing interim-use permits, particularly AS 16.43.210(a), but also AS 16.43.140(a), AS 16.10.267(a)(1), and AS 16.05.675. Following the court of appeals decision in this case, the legislature amended AS 16.43.210(a) so that it is now clear that the CFEC may issue interim-use permits for all Alaska fisheries, regardless of whether the fishery is subject to limited entry.[9] In this decision, we examine whether the State was authorized to issue interim-use permits for all Alaska fisheries before the effective date of the amendment.

 (c) The commissioner may authorize the Commercial Fisheries Entry Commission to issue landing permits for a fishery if the commissioner has made a written finding that the issuance of landing permits for that fishery is consistent with state resource conservation and management goals.

9. AS 16.43.210(a), *as amended by* ch. 20, § 1, SLA 2004. The amended AS 16.43.210(a) states:

 For each fishery that is not subject to a maximum number of entry permits under AS 16.43.240 and not subject to a moratorium under AS 16.43.225, the commission shall issue interim-use permits under regulations adopted by the commission to all applicants who can establish their present ability to participate actively in the fishery for which they are making application.

In addition, the CFEC amended 20 AAC 05.110 after the court of appeals declared it invalid. As it existed in 2001, 20 AAC 05.110 required anyone possessing fish for a commercial purpose to have either an interim-use or entry permit card.[10] Now the regulation requires either an entry permit, an interim-use permit, or a landing permit.[11] We examine whether the prior version of the regulation was valid when the State sought to apply it against the respondents.

## III. DISCUSSION

### A. Standard of Review

▬ We review a grant or denial of a motion to dismiss de novo.[12] We also review questions of law de novo, adopting "the rule of law that is most persuasive in light of precedent, reason and policy."[13] Statutory interpretation is a question of law to which we apply our independent judgment.[14] When reviewing an agency decision that raises questions of statutory interpretation involving legislative intent, we review the questions independently, applying the substitution-of-judgment standard.[15]

10. 20 AAC 05.110(a) (2001).

11. 20 AAC 05.110(a) (2004). The amended version of 20 AAC 05.110(a) states in relevant part:
It is unlawful for any person to possess, within water subject to the jurisdictions of the state, any fish or shellfish, taken for a commercial purpose, aboard a fishing vessel commonly used for taking that species of fish or shellfish unless the person has in that person's possession a valid interim-use or entry permit card to take the fish or shellfish in that person's possession with the gear with which the vessel is equipped or a landing permit for the species of fish possessed unless waived by the commission for good cause.

12. *McElroy v. Kennedy,* 74 P.3d 903, 906 (Alaska 2003).

13. *Langdon v. Champion,* 745 P.2d 1371, 1372 n. 2 (Alaska 1987) (citation omitted).

14. *W. Star Trucks, Inc. v. Big Iron Equip. Serv., Inc.,* 101 P.3d 1047, 1048 (Alaska 2004).

15. *Alaska Ctr. for the Env't v. Rue,* 95 P.3d 924, 926 (Alaska 2004).

16. *See, e.g., Deaver v. Auction Block Co.,* 107 P.3d 884, 888 & n. 4 (Alaska 2005) (observing that

### B. Overview of Fisheries Management

Alaska's fisheries are subject to a complex regulatory system consisting of state and federal laws as well as international agreements.[16] The laws and regulations applicable to this case are summarized below.

### 1. Federal regulation of fisheries

In 1976 Congress enacted the Magnuson–Stevens Fishery Conservation and Management Act (Magnuson–Stevens Act) to manage the fisheries found off the coast of the United States.[17] The purpose of the Magnuson–Stevens Act was to conserve and manage fisheries within a 200–mile radius called the Exclusive Economic Zone, or EEZ.[18] The Magnuson–Stevens Act created regional fishery management councils, including the North Pacific Fishery Management Council, which governs the Gulf of Alaska.[19] The management councils submit fishery management plans to the Secretary of Commerce, who then promulgates regulations based on those plans.[20]

Alaska's halibut fisheries are also governed by a convention between the United States and Canada (the Halibut Convention).[21] The

"the commercial fishing industry in Alaska is highly regulated").

17. Magnuson–Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1883 (2000). The Act is alternatively referred to as the Fishery Conservation and Management Act of 1976.

18. 16 U.S.C. § 1811 (2000); Proclamation No. 5030, 48 Fed.Reg. 10605 (March 14, 1983) (creating the EEZ).

19. 16 U.S.C. § 1852(a) (2000).

20. 16 U.S.C. §§ 1852(h), 1853, 1854. The regulations governing the Gulf of Alaska are codified at: Fisheries of the Exclusive Economic Zone Off Alaska, 50 C.F.R. pt. 679 (2005). *See United States v. Ertsgaard,* 222 F.3d 615, 616 n. 1 (9th Cir.2000).

21. Convention for the Preservation of the Halibut Fishery of the Northern Pacific Ocean and Bering Sea, March 2, 1953, U.S.-Can., 5 U.S.T. 5 and Protocol Amending the Convention Between the United States and Canada for the Preservation of the Halibut Fishery of the Northern Pacific Ocean and Bering Sea, March 29, 1979, U.S.-Can., 32 U.S.T. 2483.

Halibut Convention is implemented in the United States by the Northern Pacific Halibut Act of 1982 (Halibut Act).[22] The Halibut Act grants authority to the North Pacific Fishery Management Council (established by the Magnuson–Stevens Act) to develop regulations for the management of Alaska's halibut fisheries.[23] These regulations set forth the individual fishing quota program in which Dupier, Miller, and Twohy were participating when they received citations from the State.[24]

### 2. State regulation of fisheries

The Alaska Legislature enacted the Limited Entry Act[25] in 1973 after finding that use levels in Alaska's fisheries had become high enough to impair "the economic welfare of the fisheries of the state, the overall efficiency of the harvest, and the sustained yield management of the fishery resource."[26] The Act created the CFEC and charged it with regulating entry into the state's commercial fisheries.[27] The CFEC's permitting scheme is the primary mechanism for enforcing the Limited Entry Act. We examine the scope of the CFEC's authority under the Limited Entry Act below.

### C. The CFEC Did Not Exceed Its Authority by Requiring the Respondents To Possess Interim–Use Permits Under 20 AAC 05.110.

Dupier, Miller, and Twohy argue that the CFEC exceeded its authority when it required them to possess interim-use permits under 20 AAC 05.110. In our analysis of this claim, we first examine whether state law authorized the CFEC to issue interim-use permits for state fisheries not subject to limited entry. We then turn to the question whether state law authorized the CFEC to require interim-use permits for fishers who sought to fish solely in federal waters but who desired to land their fish in Alaska.

### 1. Alaska law authorized the CFEC to issue interim-use permits for state fisheries not subject to limited entry.

██ If the CFEC was not authorized to issue interim-use permits for fisheries in which limited entry was neither in place nor pending, it was not authorized to require them for the respondents. For this reason, we begin our analysis by examining whether the CFEC was authorized to issue interim-use permits for state fisheries not subject to limited entry.

As it existed in 2001, the Alaska statute governing interim-use permits, AS 16.43.210, stated:

> **Interim-use permit; qualifications.** (a) Pending the establishment of the maximum number of entry permits under AS 16.43.240 and the issuance of entry permits under AS 16.43.270, the [CFEC] shall issue interim-use permits under regulations adopted by the commission for each fishery, not subject to a moratorium under AS 16.43.225, to all applicants who can establish their present ability to participate actively in the fishery for which they are making application.[28]

Whether the CFEC was authorized to require interim-use permits turns in part on the meaning of the word "pending." The meaning of that word is ambiguous. The respondents argue that this statute only authorized the CFEC to issue interim-use permits under two circumstances: first, as the initial phase in a limited entry scheme, and second, after the maximum number of entry permits has been established but before all the authorized permits have been issued for a given fishery. In particular, the respondents argue that the word "pending" indicates that the legislature intended interim-use permits to be issued for fisheries in

---

**22.** Northern Pacific Halibut Act of 1982, 16 U.S.C. § 773 (2000).

**23.** 16 U.S.C. § 773c(c); *Ertsgaard*, 222 F.3d at 617 n. 4.

**24.** 50 C.F.R. pt. 679. The regulations contained in 50 C.F.R. pt. 679 are promulgated under the authority of the Magnuson–Stevens Act, the Halibut Act, and the Pacific Salmon Treaty Act. *See Ertsgaard*, 222 F.3d at 618.

**25.** AS 16.43.010–990.

**26.** AS 16.43.010(b). For a history of the Limited Entry Act, *see Johns v. Commercial Fisheries Entry Comm'n*, 758 P.2d 1256, 1258 (Alaska 1988).

**27.** AS 16.43.100(a)(1).

**28.** Former AS 16.43.210.

which limited entry programs were either in place or imminent. The State, on the other hand, argues that the word "pending" indicates that the legislature intended the permits to be issued for all fisheries where the establishment of the maximum number of entry permits and the issuance of entry permits was not accomplished—in other words, for every fishery not limited to entry.[29] We find the State's interpretation to be more persuasive.

The starting point for our analysis of the CFEC entry permit system is AS 16.43.140, the statute requiring either a valid entry permit or an interim-use permit for commercial fishers in Alaska's fisheries.[30] This statute is one of three enabling statutes cited in 20 AAC 05.110, the regulation under which the State initially charged the respondents for not having interim-use permits.[31] The coverage of AS 16.43.140(a) is comprehensive. It applies to "the commercial taking of fishery resources" without limitation.[32] It thus applies to all commercial fisheries regardless of whether they are or will be fisheries in which entry is limited.

Until 1977, AS 16.43.140 operated in conjunction with state statutes requiring fishers to obtain gear licenses in order to operate fishing gear in Alaska's commercial fisheries. From the time the entry permit program was established in 1973 until gear licenses were abolished, commercial fishers were required to obtain either entry permits or interim-use permits, as well as gear licenses.[33] The legislature abolished gear licenses in 1977.[34] After gear licenses were abolished, fishers were required to obtain only entry permits or interim-use permits.

All commercial fishers fishing for halibut in state waters were required to have gear licenses before the statute requiring gear licenses was repealed, and the CFEC has required all commercial fishers to have interim-use permits since 1974. The legislative history indicates that the legislature abolished gear licenses to eliminate duplication between the entry permit program and the gear licensing program. For instance, Governor Hammond's transmittal letter to the legislature stated: "The bill would eliminate the currently required gear license and commercial fishing license for holders of entry permits and thus simplify the paper-work of license applications for all concerned, especially the fishermen."[35] Similarly, a letter from the CFEC chairperson to the Senate Resources Committee chairperson stated: "The new system we are proposing will result in eliminating State agency duplication of time and effort, create a much needed data base, and most important will eliminate much of the bureaucratic paperwork for the fishermen."[36] This history indicates that the leg-

---

**29.** The State argues that the 2004 amendment to AS 16.43.210(a) serves as a legislative clarification of pre-existing law. But in *Hillman v. Nationwide Mut. Fire Ins. Co.,* we reasoned: "While the legislature is fully empowered to declare present law by legislation, it is not institutionally competent to issue opinions as to what a statute passed by an earlier legislature meant." 758 P.2d 1248, 1252–53 (Alaska 1988). We have followed the *Hillman* rule in a number of subsequent cases. *See State, Dep't of Revenue v. OSG Bulk Ships, Inc.,* 961 P.2d 399, 406 n. 13 (Alaska 1998); *Univ. of Alaska v. Tumeo,* 933 P.2d 1147, 1156 (Alaska 1997); *Hickel v. Cowper,* 874 P.2d 922, 925 n. 7 (Alaska 1994); *Flisock v. State, Div. of Ret. & Benefits,* 818 P.2d 640, 645 (Alaska 1991); *Wrangell Forest Prods. v. Alderson,* 786 P.2d 916, 918 n. 1 (Alaska 1990). In this case, we decline to treat the 2004 amendment as a legislative clarification of the pre-existing law.

**30.** Former AS 16.43.140(a) provided in 2001: "After January 1, 1974, a person may not operate gear in the commercial taking of fishery resources without a valid entry permit or a valid interim-use permit issued by the [CFEC]."

**31.** *See* 20 AAC 05.110 (2001). The other enabling statutes cited in the regulation are AS 16.43.100(b) (granting the CFEC power "to do all things necessary to the exercise of its powers under this chapter") and AS 16.43.110 (granting the CFEC authority to adopt regulations).

**32.** AS 16.43.140(a).

**33.** *Carlson v. State (Carlson I),* 798 P.2d 1269, 1271 (Alaska 1990).

**34.** *Id.; see also* ch. 105, § 19, SLA 1977.

**35.** Transmittal letter from Governor Hammond to the legislature, 1977 Senate Journal 200 (Feb. 4, 1977); *see also* Letter from Roy A. Rickey, Chairman of the CFEC, to the Honorable Kay Poland, Chairman of the Senate Resources Committee (Feb. 23, 1977) (in legislative file for S.B. 128); Commercial Fisheries Entry Commission, A Report on Senate Bill 128 (Feb. 22, 1977) (in legislative file for S.B. 128).

**36.** Letter from Roy A. Rickey, Chairman of the CFEC, to the Honorable Kay Poland, Chairman

islature intended that interim-use permits serve the same broad purposes that gear licenses had previously served.

The proposition that the legislature intended interim-use permits to serve the purposes of gear licenses is further supported by the fee structure for interim-use permits. When the legislature abolished gear licenses, the fees that had previously been collected from gear licenses were revised and applied to entry permits and interim-use permits.[37] Taken together, this legislative history indicates that when the legislature abolished gear licenses, it anticipated that the CFEC would issue interim-use permits to commercial halibut fishers even in state fisheries where limited entry was not pending, since gear licenses had previously been required in non-limited fisheries. We therefore conclude that the CFEC was authorized to issue interim-use permits for persons fishing in all state fisheries. We next examine whether the CFEC was authorized to require fishers in the EEZ to possess interim-use permits to land their fish in Alaska.

### 2. Alaska law authorized the CFEC to require fishers in the EEZ to possess interim-use permits to land their fish in Alaska.

■ Having determined that the CFEC was authorized to issue interim-use permits for fisheries not subject to limited entry, we turn to the question whether the CFEC was authorized to require interim-use permits for fishers who operated gear solely in the EEZ but wished to land their catches in Alaska. We conclude that the CFEC was authorized to require interim-use permits for federally permitted fishers landing their catches in Alaska.

of the Senate Resources Committee (Feb. 23, 1977) (in legislative file for S.B. 128).

37. *Carlson I,* 798 P.2d at 1271.

38. AS 16.43.140(a). "Gear" is defined as "the specific apparatus used in the commercial harvest of a species, including but not limited to purse seines, drift gill nets, set gill nets, and troll gear." AS 16.43.990(5).

39. AS 16.43.210(a).

### a. Interim-use permits serve purposes other than authorizing gear operation.

As discussed above, AS 16.43.140 prohibits any person from operating gear in the commercial taking of fishery resources without a valid entry permit or interim-use permit.[38] Alaska Statute 16.43.210 requires applicants for interim-use permits to "establish their present ability to participate actively in the fishery for which they are making application."[39] The respondents argue that the legislature designed interim-use permits for active participants, or gear operators, in a given fishery, not for fishers seeking to land fish caught elsewhere. The State argues that interim-use permits serve purposes in addition to authorizing the operation of gear, including authorization for possession and landing. Our examination of various provisions in the Limited Entry Act reveals that interim-use permits do serve purposes in addition to authorizing gear operation.

For instance, AS 16.10.267(a) requires any fisher selling fish to possess a landing permit, entry permit, or interim-use permit.[40] Thus, fishers who wish to sell fish must possess a CFEC permit even if they do not intend to operate gear in state fisheries. An interim-use permit will satisfy the statute, regardless of whether the permit holder plans to operate gear. Moreover, when AS 16.10.267(a) was adopted in 1982, it codified, as to sales, and ratified an existing CFEC regulation that prohibited fishers from possessing fish within state waters for a "commercial purpose" without an interim-use permit.[41] Under the regulation, "commercial purpose" included the sale and transportation of fish.[42] The regulation was specifically aimed at fish taken beyond the waters of the state. The CFEC finding accompanying the

40. AS 16.10.267(a)(1) states: "When a fisherman sells fish, the fisherman shall possess (1) a landing permit, entry permit, or interim-use permit issued or transferred to the fisherman under AS 16.43, or other document authorized by regulation to be used in place of an entry permit or interim-use permit."

41. 20 AAC 05.075 (former regulation).

42. *Id.*

regulation explained that the regulation was necessary because otherwise "a fisherman taking fish and shellfish in state waters need only claim that they were taken elsewhere in order to avoid state law."[43] Thus, AS 16.10.267(a), together with the regulation that it partially codified and ratified, illustrates that interim-use permits serve purposes in addition to authorizing the operation of gear.[44]

### b. The legislature intended landing permits to have a narrow purpose not applicable to the respondents in this case.

Dupier, Miller, and Twohy argue that the State should have required them to possess landing permits, rather than interim-use permits.[45] But landing permits were created in 1984[46] for a narrow class of fishers that does not include the respondents. This narrow scope of landing permits is delineated in a letter from the Attorney General to Governor Sheffield regarding the amendment to the Limited Entry Act that created landing permits.[47] The letter indicates that the legislature created landing permits after two fishers who were legally fishing for salmon in federal waters attempted to land their catches in Alaska. When they were informed that they would not be permitted to land in Alaska because they did not possess the appropriate state permits, they threatened to sue the state. Rather than litigate the issue, the Attorney General recom-

mended that the legislature create a permit to accommodate fishers in this situation.[48]

The difference between the fishers who prompted the creation of landing permits and the respondents in this case is that the 1984 fishers were fishing for salmon. Alaska's salmon fisheries had been subject to limited entry by the state, so the two salmon fishers could not obtain interim-use permits or entry permits, which were distributed on a limited basis and would have permitted them to fish for salmon in state waters. In contrast, the CFEC has not limited entry to Alaska's halibut fisheries, so the respondents in this case could have procured interim-use permits if they had applied for them.[49]

This history indicates that landing permits were intended for the narrow situation embodied by the 1984 salmon fishers: fishers holding permits to fish in federal waters who are precluded from obtaining interim-use or entry permits from the state due to existing limited entry programs.[50] This conclusion is supported by the Attorney General's 1984 letter to the Governor, which states: "Aside from the two fishermen who hold federal permits, but not state permits, for the salmon power troll fishery, the only possible application of these landing permits would be in the crab fishery if that is eventually limited by the state."[51] We conclude that the creation of landing permits did not alter the scope of interim-use permits, and that the existence of landing permits did not preclude

---

**43.** CFEC Finding of Emergency, May 13, 1974, in regulation file for former 20 AAC 05.075.

**44.** AS 16.10.267(a) also supports the authority of the CFEC to promulgate 20 AAC 05.110, the regulation under which the respondents are charged, because section .110 is similar to and an historical successor of former regulation 20 AAC 05.075. We note that our discussion of AS 16.10.267 is intended only to illustrate that interim-use permits may serve purposes other than authorizing gear operation. The State apparently sought to charge all three respondents with violating AS 16.10.267, but the charging documents were only served on Miller and were never filed with the court.

**45.** The respondents additionally note that the State had never issued landing permits in 2001.

**46.** Ch. 145, § 1, SLA 1984.

**47.** Letter, re: CSHB 376(Res) am. from Attorney General Gorsuch to Governor Bill Sheffield (June 21, 1984).

**48.** *Id.*

**49.** The State acknowledges that four sablefish fisheries have been limited to entry, but asserts that Twohy could have obtained a statewide interim-use permit for sablefish under 20 AAC 05.230(a)(8) that would not have allowed him to harvest sablefish in the limited entry areas.

**50.** We do not need to decide whether new regulations issued by the CFEC have broadened the scope of landing permits.

**51.** Letter, re: CSHB 376(Res) am from Attorney General Gorsuch to Governor Bill Sheffield (June 21, 1984).

the State from requiring the respondents to possess interim-use permits.

Finally, we note that the landing permit statute gives the CFEC commissioner discretion to authorize the issuance of landing permits for a given fishery.[52] If the legislature had intended to require landing permits for all landings, the legislature would not have made the issuance of the permits discretionary. In contrast, the statute governing interim-use permits makes their issuance mandatory.[53] We also note that AS 16.05.675 explicitly requires that those who have not been issued landing permits must either hold limited entry permits or interim-use permits in order to deliver or land fish in the state. This also supports our conclusion that the State was authorized to require interim-use permits for fishers fishing in the EEZ.[54]

### D. The State Did Not Exceed Its Authority when It Charged the Respondents with Violating AS 16.05.675.

 The respondents claim that the State exceeded its authority when it charged them with violating AS 16.05.675 because the statute requires fishers to possess landing permits, not interim-use permits or entry permits. We disagree. Alaska Statute 16.05.675 requires either an entry permit, interim-use permit, or a landing permit.[55] Although landing permits are the focus of the statute, the State did not exceed its authority when it charged the respondents with a violation of the statute because they did not possess any type of CFEC permit. As discussed above, the State was not required to

issue landing permits to the respondents because the legislature made the issuance of landing permits discretionary, and the respondents did not fall into the category of fishers for whom landing permits were intended. Yet they were still required to possess a permit under AS 16.05.675.

### E. Federal Law Does Not Preempt State Permit Requirements.

 Dupier, Miller, and Twohy next argue that the CFEC is preempted by federal law from requiring permits of fishers participating in the federal IFQ program. Under the Supremacy Clause of the federal constitution,[56] state laws that interfere with federal laws are invalid.[57] Federal laws can preempt state laws in the following three ways: (1) if Congress expressly declares that state law is preempted; (2) if Congress demonstrates an intent to occupy a field exclusively; and (3) if there is an actual conflict between federal and state law.[58] "Preemption may be either express or implied."[59] When considering preemption, courts "start with the assumption that the historic police powers of the states were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."[60]

The respondents acknowledge that there is no express declaration of preemption in any of the federal laws governing fisheries off Alaska's coast. They argue instead that Congress intended to occupy the field of halibut fishery management and that the CFEC's interpretation of Alaska's statutes creates an actual conflict between federal and state law.

---

**52.** AS 16.05.675(c).

**53.** AS 16.43.210(a) ("the [CFEC] shall issue interim-use permits ... to all applicants").

**54.** AS 16.05.675 also supports the authority of the CFEC to promulgate 20 AAC 05.110. The statute prohibits delivering or landing fish in the state without a limited entry permit or an interim-use permit and the regulation prohibits possession of fish without such a permit. The regulation is within the scope of the statute because one may not deliver or land fish without also possessing them.

**55.** AS 16.05.675.

**56.** U.S. Const. art. VI, cl. 2.

**57.** *Wis. Pub. Intervenor v. Mortier,* 501 U.S. 597, 604, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991).

**58.** *Totemoff v. State,* 905 P.2d 954, 958 (Alaska 1995).

**59.** *State v. F/V Baranof,* 677 P.2d 1245, 1249 (Alaska 1984) (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)).

**60.** *Mortier,* 501 U.S. at 605, 111 S.Ct. 2476 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)); *see*

1. **Congress did not intend to occupy the field of halibut fishery management with respect to permits required for landing fish in Alaska when it passed the Halibut Act.**

■■■■■■■ Dupier, Miller, and Twohy first claim that the Halibut Act preempts state regulation of halibut fisheries because it demonstrates an intent on the part of Congress to occupy the field in this area. The respondents rely on an informal opinion letter written by the Attorney General to a member of the Alaska Legislature in 1995.[61] In this opinion, the Attorney General concluded that the Halibut Act preempted state management of halibut within both federal and state waters.[62]

The Attorney General's opinion rests on the fact that the Halibut Treaty, which the Halibut Act implements, applies to both federal and state waters. Therefore, the Attorney General concluded, Congress intended to occupy the field when it adopted the Halibut Treaty. The Attorney General also observed that the Halibut Act does not contain any provision providing for regulation of halibut by the states.

The State does not contest the Attorney General's conclusion that it is preempted from enacting halibut management measures that conflict with measures in the Halibut Act. Instead, the State argues that federal regulations make clear that state permitting measures are not preempted for the purpose of regulating and tracking fish landings. The Halibut Act permits the Secretary of Commerce and the United States Coast Guard to enter into agreements with state agencies to enforce the Halibut Act, giving

the states some role in the management of halibut.[63] To that end, the International Pacific Halibut Commission has promulgated regulations requiring landings of halibut to be recorded on state fish tickets [64] and stating that halibut licenses are in addition to any licenses required under the laws of the states.[65] Similarly, regulations promulgated under the IFQ program state that the initial allocation of quota shares for halibut and sablefish in the EEZ is predicated upon "compliance with state and Federal regulations in effect at the time of the landing." [66] Compliance with state regulations is demonstrated through state fish tickets.[67]

Although we have not specifically examined preemption under the Halibut Act in previous cases, we have examined whether state regulation of fisheries is generally preempted under the Magnuson–Stevens Act. In *F/V Baranof*, we concluded that Congress did not intend to fully occupy the field of fisheries management when it passed the Magnuson–Stevens Act.[68] We noted that the Magnuson–Stevens Act permits states to regulate fishing vessels outside state boundaries, so long as the vessels are registered under state laws.[69] Therefore, we concluded that the Magnuson–Stevens Act does not preempt state regulation for every aspect of fisheries management. *F/V Baranof* concerned the state's regulation of king crab, a species for which no separate federal regulations existed. Although management of the halibut fishery is governed primarily by the Halibut Act, *F/V Baranof* is instructive in this case because it illustrates that we will not infer an intent to occupy the field where Congress has left some room for state involvement.[70] In *F/V Baranof*, we also con-

---

*also Native Village of Eklutna v. Alaska R.R. Corp.*, 87 P.3d 41, 56 (Alaska 2004).

**61.** 1996 Informal Op. Att'y Gen. 15, 1995 WL 1054099 (Alaska A.G., July 31, 1995).

**62.** *Id.* The weight accorded to opinions of the Attorney General is largely within our discretion. In general, they are not controlling but are entitled to some deference. *State v. Kenaitze Indian Tribe*, 83 P.3d 1060, 1066 n. 22 (Alaska 2004).

**63.** 16 U.S.C. § 773(I) (2000).

**64.** Pacific Halibut Fisheries; Catch Sharing Plans, 66 Fed.Reg. 15806 (March 21, 2001) (to be codified at 50 C.F.R. pt. 300).

**65.** Pacific Halibut Fisheries; Catch Sharing Plans, 66 Fed.Reg. at 15804.

**66.** Individual Fishing Quota Management Measures, Sablefish and Halibut Quota Share, 50 C.F.R. § 679.40(a)(3)(v)(A) (2005).

**67.** 50 C.F.R. § 679.40(a)(3)(v)(B).

**68.** 677 P.2d at 1250.

**69.** *Id.*; 16 U.S.C. § 1856(a) (2000).

**70.** *See Native Village of Eklutna*, 87 P.3d at 56–57 (examining purpose of federal act to determine whether Congress intended to preempt all local and state regulation).

sidered that the state's fisheries management programs shared the same goal as the Magnuson–Stevens Act—conservation of fisheries.[71] Similarly, the Halibut Act leaves some room for state involvement in enforcement of the act, and the state's permitting scheme shares the same goal of the Halibut Act—conservation of fisheries. For these reasons, we conclude that the Halibut Act does not reflect an intent on the part of Congress to occupy the field of halibut fishery management with respect to permits required for landing fish in Alaska.

### 2. The CFEC's permit requirements do not create an actual conflict with federal law.

 Dupier, Miller, and Twohy argue that the CFEC's permit requirement creates a direct conflict with federal law. State law is preempted "if the state law conflicts with the federal law to the extent that (a) it is impossible to comply simultaneously with both or (b) the state regulation obstructs the execution of the purpose of the federal regulation."[72]

The respondents argue that a conflict exists because a corporation, firm, or association may participate in the federal IFQ program, whereas the interim-use permits issued by the CFEC are only available to individuals. Therefore, they argue that some fishers who are legally fishing in federal waters might not qualify for an interim-use permit. This is not the case in practice. According to the State, a corporation participating in the federal IFQ program must assign its annual IFQ to a natural person who harvests the fish. The assignee is the person who must obtain a CFEC permit.[73] Therefore, it is possible to comply simultaneously with both the federal permitting scheme and the state permitting scheme. Moreover, the purpose of both permitting schemes is to conserve fishery resources.[74] We conclude that the State's requirement that federally permitted fishers possess interim-use permits to land their halibut catch in Alaska is not preempted by federal law.

### 3. The Magnuson–Stevens Act does not preempt the CFEC from requiring permits of federal sablefish or halibut fishers.

 The respondents also argue that the CFEC's permit requirements are preempted by the Magnuson–Stevens Act.[75] The Magnuson–Stevens Act provides in relevant part: "the United States claims, and will exercise in the manner provided for in this chapter, sovereign rights and exclusive fishery man-

---

**71.** *F/V Baranof,* 677 P.2d at 1251.

**72.** *Interior Reg'l Hous. Auth. v. James,* 989 P.2d 145, 149 (Alaska 1999) (quoting *In re J.R.B.,* 715 P.2d 1170, 1172 (Alaska 1986)).

**73.** The respondents may seek to disprove the State's factual assertion on this point at trial.

**74.** Miller also argues that the CFEC permit program creates a direct conflict with federal law because it discriminates between residents and nonresidents in violation of the Halibut Act. The Halibut Act authorizes the Regional Fishery Management Council to develop fishing regulations so long as the regulations do not discriminate between residents of different states. 16 U.S.C. § 773c(c) (2000). Miller contends that the CFEC does discriminate against residents and nonresidents by charging different fees for interim-use permits, and that this creates a conflict with federal law. A decision that the CFEC's fee schedule is preempted by federal law would not resolve whether the CFEC is preempted from requiring interim-use permits for IFQ holders—it would merely invalidate the fee

schedule. *See McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco,* 496 U.S. 18, 40, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990) (striking down portion of tax liquor charged to nonresidents and noting that "the State may retain the tax appropriately levied upon petitioner ... because this retention would deprive petitioner of its property pursuant to a tax scheme that is *valid* "). *But see Toomer v. Witsell,* 334 U.S. 385, 403, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948) (invalidating entire licensing statute where it imposed unfair fee on nonresidents); *United States v. Hagen,* 782 F.Supp. 1351, 1363 (D.Neb.1991). Moreover, it is not clear that there is a conflict with 16 U.S.C. § 773c(c), which merely requires a particular *federal* agency not to discriminate between residents of different states. 16 U.S.C. § 773c(c) (2000).

**75.** All three respondents argue that the Halibut Act is the primary source of federal preemption for the halibut fishery. Their preemption arguments regarding Twohy's sablefish charge focus on the Magnuson–Stevens Act. However, Miller argues that the Magnuson–Stevens Act also preempts the CFEC from regulating the halibut fishery.

agement authority over all fish, and all Continental Shelf fishery resources, within the exclusive economic zone." [76] Some courts have indicated that this provision preempts state attempts to regulate landings of fish caught in the EEZ.[77] But these cases involve outright bans on landings or landing limits that prevent fishers from landing fish in amounts permitted under federal law.[78] Other courts have upheld state regulations that apply to EEZ fishers.[79]

The CFEC's interim-use permit program does not thwart the goals of the Magnuson–Stevens Act; nor does it prevent federally permitted fishers from landing their fish. Essentially everyone who applies for an interim-use permit receives one, the permit imposes no restrictions on catch or gear, and the fee is relatively low. Moreover, as the court of appeals recognized in *State v. Kalve*,[80] regulations promulgated under the Magnuson–Stevens Act contemplate that states will regulate halibut and sablefish landings in some fashion. The regulations base a fisher's federal quota for halibut and sablefish on the fisher's prior "legal landings" of halibut and sablefish in IFQ fisheries.[81] The regulations define "legal landing" as follows: "As used in this section, a 'legal landing of halibut or sablefish' means halibut or sablefish harvested with fixed gear and landed in compliance with *state and Federal* regulations in effect at the time of the land-

ing." [82] These regulations indicate that the state may regulate some aspects of halibut and sablefish landings in Alaska.[83]

We also note that the Magnuson–Stevens Act carves out an exception to § 1811 for boats registered with the state. The exception is codified at 16 U.S.C. § 1856(a)(3), which states:

> [A] State may regulate a fishing vessel outside the boundaries of the State in the following circumstances: (A) The fishing vessel is registered under the law of that State, and ... (ii) the State's laws and regulations are consistent with the fishery management plan and applicable Federal fishing regulations for the fishery in which the vessel is operating.[84]

At this stage in the litigation it is not necessary to determine whether this exception might apply in this case. But in our opinion the exception supports our conclusion that the Magnuson–Stevens Act does not preempt all aspects of state regulation of fish caught in EEZ waters.[85] Finally, we note that our conclusion on the preemption question is limited to the narrow question whether the CFEC is preempted from requiring interim-use permits for fishers landing their catches in Alaska; we need not decide the extent to which the State is preempted from regulating other aspects of the halibut and sablefish fisheries.

**76.** 18 U.S.C. § 1811(a) (2000).

**77.** *See City of Charleston, S.C. v. A Fisherman's Best, Inc.,* 310 F.3d 155, 175 (4th Cir.2002) (concluding that municipal regulation prohibiting longline vessels from landing at city's maritime center was preempted by § 1811); *S.E. Fisheries Ass'n, Inc. v. Chiles,* 979 F.2d 1504, 1510 (11th Cir.1992) (indicating that state catch limits on Spanish mackerel landed in Florida were preempted by § 1811 and remanding for further proceedings); *State v. Sterling,* 448 A.2d 785, 787 (R.I.1982) (stating in dicta that Magnuson–Stevens Act preempted state catch limits for yellowtail flounder).

**78.** *Id.*

**79.** *See La. Seafood Mgmt. Council, Inc. v. Foster,* 917 F.Supp. 439, 443 (E.D.La.1996) (upholding state regulation that applied only in state waters); *People v. Weeren,* 26 Cal.3d 654, 163 Cal. Rptr. 255, 607 P.2d 1279, 1287 (1980) (conclud-

ing that California could regulate a California-registered vessel outside its waters so long as there was no conflict with federal law); *Raffield v. State,* 565 So.2d 704, 705 (Fla.1990) (concluding that state regulation prohibiting landing of red fish with a purse seine did not violate Magnuson–Stevens Act).

**80.** 9 P.3d 291, 294 (Alaska App.2000).

**81.** 50 C.F.R. § 679.40(a)(4).

**82.** 50 C.F.R. § 679.40(a)(3)(v)(A) (emphasis added).

**83.** *See Kalve,* 9 P.3d at 294.

**84.** 16 U.S.C. § 1856(a)(3) (2000).

**85.** *See Foster,* 917 F.Supp. at 443; *Weeren,* 163 Cal.Rptr. 255, 607 P.2d at 1286.

### F. State Permit Requirements Did Not Violate the Federal Constitution.

The respondents argue that AS 16.05.675 and 20 AAC 05.110 are impermissibly vague so as to deprive the respondents of due process in violation of the federal constitution. Miller additionally asserts that the State's fee structure for interim-use permits violates the Commerce and Privileges and Immunities Clauses of the federal constitution because permits cost less for Alaska residents than for nonresidents.

#### 1. Neither AS 16.05.675 nor 20 AAC 05.110 was impermissibly vague.

 The respondents argue that AS 16.05.675 and the pre-amendment version of 20 AAC 05.110 were unconstitutionally vague because the provisions did not notify the respondents of the conduct that is prohibited. Under the federal constitution, the void-for-vagueness doctrine requires a penal statute or regulation to be sufficiently clear so that ordinary people can understand what conduct is prohibited.[86] Neither of the provisions at issue in this case was unclear. Alaska Statute 16.05.675 was unambiguous in its requirement that fishers must possess either an entry permit, interim-use permit, or a landing permit in order to land their catches.[87] None of the respondents possessed any of these permits.[88] Similarly, 20 AAC 05.110 required fishers to obtain an entry permit or interim-use permit in order to possess commercially taken fish in state waters.[89] The respondents did not possess any type of permit, despite the clear language of these provisions.[90] We find that ordinary people could discern what was required of them under these provisions.

#### 2. Miller's constitutional arguments are without merit.

 Miller argues that the higher permit fees assessed against nonresidents violate the Privileges and Immunities and Commerce Clauses of the federal constitution. We examined whether different rates can be charged for nonresident and resident fishers in the ongoing *Carlson* litigation.[91] In *Carlson II*, we held that fee differentials charged by the CFEC to nonresident fishers for commercial fishing permits did not implicate interstate commerce.[92] We similarly hold that the Commerce Clause is not implicated here. We also held in *Carlson II* that different rates may be charged for resident and nonresident commercial fishers without violating the Privileges and Immunities Clause, and we derived a formula for calculating the acceptable difference.[93]

Relying in part on his preemption argument, Miller attempts to distinguish the *Carlson* cases on the ground that "the State of Alaska does not actively mange the halibut fishery." Therefore, Miller argues, the CFEC cannot justify the higher permit fees for nonresident fishers on the basis that Alaska residents "pay proportionately more in foregone benefits than nonresidents for fisheries management" of the halibut fishery, as delineated in our Privileges and Immunities analysis in *Carlson I*.[94] But as we discuss

---

86. *Treacy v. Municipality of Anchorage*, 91 P.3d 252, 260–61 (Alaska 2004).

87. Former AS 16.05.675; *see supra* text of statute accompanying note 8.

88. Dupier states in two affidavits that he attempted to procure the appropriate state permits but was given incorrect information by state officials. Under our case law, private parties may invoke estoppel against the state under exceptional circumstances as a means to avoid injustice. *See Alaska Trademark Shellfish, LLC v. State*, 91 P.3d 953, 960 (Alaska 2004). Dupier does not ask us to invoke this equitable remedy here, so we do not consider whether estoppel might be appropriate. Dupier is free to pursue this argument on remand.

89. 20 AAC 05.110 (2001).

90. As we discuss in Part III.C.1 of this decision, the meaning of the pre-amendment AS 16.43.210 was ambiguous. However, that statute concerns the scope of the State's authority to require interim-use permits of federally-permitted fishers, not the requirement that fishers obtain permits. The penal provisions under which the respondents were charged, AS 16.05.675 and 20 AAC 05.110, do not contain ambiguous language.

91. *State, Commercial Fisheries Entry Comm'n v. Carlson (Carlson III)*, 65 P.3d 851 (Alaska 2003); *Carlson v. State, Commercial Fisheries Entry Comm'n (Carlson II)*, 919 P.2d 1337 (Alaska 1996); *Carlson I*, 798 P.2d at 1269.

92. *Carlson II*, 919 P.2d at 1340.

93. *Id.* at 1342.

94. *Carlson I*, 798 P.2d at 1278.

in Part III.E of this decision, the State is not entirely preempted from regulating halibut fishers. Federal fishers landing their fish in Alaska benefit to some degree from the state's fisheries management programs. And the formula that we set forth in *Carlson II* and affirmed in *Carlson III* is based on the per capita contribution of Alaska's residents to the state's *entire* fisheries budget, not just the portion of the budget attributable to a particular type of fish.[95]

Moreover, we recognized in *Carlson I* that the proper way to protest a wrongful tax is to "protest the payment of the tax at the time of payment in order to subsequently maintain either a common law or statutory cause of action."[96] In 2001 the permit fees were set at the same 3:1 fee differential that we considered in the *Carlson* cases.[97] We did not view the fee differential as being prohibitively burdensome so as to merit waiver of the payment under protest requirement, and we similarly do not view it as overly burdensome here. If Miller wishes to challenge the fee structure, the proper method is to obtain the license and protest the fees at the time of payment.

## IV. CONCLUSION

We REVERSE the decision of the court of appeals. This case is REMANDED for further proceedings.

---

**95.** *Carlson III*, 65 P.3d at 875; *Carlson II*, 919 P.2d at 1343.

**96.** *Carlson I*, 798 P.2d at 1280 (quoting *Principal Mut. Life Ins. Co. v. State, Div. of Ins.*, 780 P.2d 1023, 1028–30 (Alaska 1989)); *see also Carlson III*, 65 P.3d at 869.

**97.** *See* former 20 AAC 05.240(a)(4) (repealed 12/21/2002). The price range for resident commercial fishing permits in 2001 was $15 to $250 and the range for nonresident permits was $45 to $750.