203 P.3d 1155 (2009)
Carla ALLEN, Appellant,
v.
STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, DIVISION OF PUBLIC ASSISTANCE, Appellee.
Ian Wallis, Appellant,
v.
State of Alaska, Department of Health & Social Services, Division of Public Assistance, Appellee.
Nos. S-12700, S-12864.
Supreme Court of Alaska.
March 27, 2009.
*1158 Nikole Nelson, Alaska Legal Services Corporation, Anchorage, for Appellants.
Rebecca C. Polizzotto, Assistant Attorney General, Juneau, Laura C. Bottger and John W. Erickson, Jr., Assistant Attorneys General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.
Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

OPINION
FABE, Chief Justice.

I. INTRODUCTION
Carla Allen and Ian Wallis are food stamp recipients who each received an excess of food stamp benefits due to errors made by the State of Alaska Department of Health and Social Services, Division of Public Assistance (hereinafter "the Agency"). The Agency seeks to recoup these overpaid benefits from Allen and Wallis by reducing their future monthly food stamp allotments. Allen and Wallis assert that Alaska's doctrine of equitable estoppel should prevent the Agency from reducing their future allotments because the overpayments were caused by the Agency's own errors. Because applying equitable estoppel to prevent recoupment of overpaid food stamps would create a conflict with federal food stamp law, which intends for such overpayments to be recouped, we hold that in this context equitable estoppel is preempted by federal law. Allen also asserts that the Agency's notice to her regarding its recoupment action did not comply with federal regulation requirements and due process. Because the notice did not sufficiently inform Allen, as required by federal regulations, of how the claim against her was calculated and of her right to copy Agency records, we conclude that the notice was inadequate.

II. FACTS AND PROCEEDINGS

A. Facts
The facts of these consolidated cases are undisputed. Appellants Carla Allen and Ian Wallis were both recipients of food stamps funded under the federal Food Stamp Act[1] and administered by the Agency pursuant to 7 Alaska Administrative Code (AAC) 46.010 et seq. Due to errors made by the Agency, both Allen and Wallis received an excess of food stamps each month for several months. When the Agency discovered its errors, it gave written notice to Allen and Wallis that it intended to reduce their future monthly food stamp allotments in order to make up for the past overpayments. Both Allen and Wallis objected, giving rise to these actions.
Carla Allen was a food stamp recipient in 2005. In August 2005 she reported to the Agency that her daughter would be leaving *1159 her household for approximately six months. This should have triggered a downward adjustment of Allen's monthly food stamp allotment, but the Agency failed to act. In November Allen again contacted the Agency regarding her daughter's absence. At that point the Agency recalculated Allen's food stamp allotment based on the reduction in her household size, as it should have done two months earlier. The Agency then mailed a notice to Allen informing her that she had received a total of $304 in excess food stamps during the months of October and November due to the agency's failure to code her daughter out of the household.
Ian Wallis applied for food stamps in May 2004. At his intake interview, Wallis accurately reported that his landlord paid for his heating costs. However, the Agency incorrectly credited him for paying his own heating costs, resulting in a higher food stamp allotment. In October 2004 the Agency discovered its error. The Agency then mailed a notice to Wallis informing him that he had received a total of $448 in excess food stamps during the months of June through October due to the incorrect utility credit.
The Agency's notices to both Allen and Wallis further stated, "[b]eginning next month, we must reduce your food stamp benefit by 10% or $10, whichever is more, until this debt is repaid. The agency can adjust the claim if full payment is not possible." The notices listed several options for faster repayment of the debt, ending with the instructions, "[i]f you cannot make the payments you have agreed to make, or you disagree with this action and want to review our records of the claim, please contact [your caseworker]." The notices also provided charts showing, for each of the months of overpayment, the amount the recipient received, the amount the recipient had been entitled to, and the corresponding amount of overpayment for that month.[2]

B. Proceedings

1. Carla Allen's appeal
After receiving the Agency's notice, Allen requested an administrative hearing. At the hearing, Allen argued that equitable estoppel should prevent the Agency from recouping the overpaid food stamps, and that the Agency's notice to her did not comply with federal regulations. The hearing officer rejected both of these arguments, holding that equitable estoppel is not available as a defense in food stamp overpayment cases and that the notice to Allen met federal regulation requirements. Allen appealed the hearing officer's decision to the Director of Public Assistance, who upheld it.
Allen then appealed to the superior court. In a written memorandum decision and order, Superior Court Judge Charles T. Huguelet affirmed the agency decision on both the equitable estoppel and the notice questions. The superior court looked to language in the Federal Register[3] and determined that Congress intended to preclude the defense of equitable estoppel under the Food Stamp Act. The superior court also decided that the Agency had provided sufficient notice to Allen under 7 C.F.R. § 273.18(e)(3)(iv). Allen then filed this appeal on both the equitable estoppel and the notice questions.

2. Ian Wallis's appeal
After receiving the Agency's notice regarding recoupment of $448 in excess food stamps, Wallis requested an administrative hearing. At the hearing, Wallis, like Allen, unsuccessfully argued that equitable estoppel should prevent the Agency from recouping the overpaid food stamps and that the Agency's notice violated the federal regulations. Wallis appealed the hearing authority's decision to the Director of Public Assistance, who upheld it.
Wallis then appealed to the superior court. Superior Court Judge Craig F. Stowers upheld *1160 the Agency decision regarding the unavailability of the equitable estoppel defense but agreed with Wallis that the Agency's notice did not meet the federal regulation requirements. Language from the Federal Register,[4] along with Judge Huguelet's decision in Allen's case, persuaded the superior court that Congress intended to preempt state equitable estoppel defenses in the context of food stamp overpayments. The superior court also decided that the Agency's notice to Wallis did not meet the 7 C.F.R. § 273.18(e)(3)(iv)(E) requirement that it show "[h]ow the claim was calculated," because it did not explain how the Agency arrived at the basic amount of Wallis's correct food stamp allotment, from which its calculation of the amount of overpayment flowed. Additionally, the superior court held that the notice was not sufficiently clear regarding "[t]he opportunity to inspect and copy records related to the claim" as required by 7 C.F.R. § 273.18(e)(3)(iv)(H). The superior court also suggested that in order to avoid notice challenges the Agency should use notices that simply copy the language in 7 C.F.R. § 273.18(e)(3)(iv)(M), stating "[t]hat the State agency may reduce any part of the claim if the agency believes that the household is not able to repay the claim."
Wallis then filed this appeal on the sole issue of whether federal law precludes the defense of equitable estoppel in food stamp overpayment cases. The Agency questions whether the superior court's decision affirming the Agency determination in part and reversing it in part constitutes an appealable final order but "supports the Court's accepting of the improper appeal as a petition for review."

III. STANDARD OF REVIEW
In an appeal from a judgment of a superior court acting as an intermediate court of appeal, we independently review the agency decision, giving no deference to the superior court decision.[5] The two issues before us are whether equitable estoppel is available as a defense to recoupment in a food stamp overpayment case and whether the Agency's notice to Carla Allen satisfied federal regulation and due process requirements. On questions of law that do not involve agency expertise, such as these, we substitute our judgment for that of the administrative agency, reviewing the legal issues de novo.[6] In substituting our judgment for that of the agency, we have a duty to "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[7]

IV. DISCUSSION

A. Federal Law Preempts the State Doctrine of Equitable Estoppel in the Context of Food Stamp Overpayments.
Allen and Wallis argue that the doctrine of equitable estoppel should prevent the Agency from recouping the food stamp overpayments they received because they spent the overpaid benefits in reasonable reliance on the Agency's mistaken assertions that they were entitled to those benefits. In both the Wallis and Allen cases, the hearing officer, the Agency's director, and the superior court declined to consider the potential applicability of this defense, holding that equitable estoppel is simply not available in food stamp overpayment cases. The Agency argues that this was the correct result because federal law preempts the state law doctrine of equitable estoppel in this context.
There is a presumption against federal preemption of state law,[8] and preemption *1161 doctrine "enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists."[9] Additionally, "[w]here co-ordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes," as is the case with the food stamp program, "the case for federal pre-emption becomes a less persuasive one."[10] But where state law comes into conflict with federal law, the Supremacy Clause of the United States Constitution[11] dictates that state law must always yield.[12]
There are three major types of federal preemption of state law: "express," "field," and "conflict" preemption.[13] Express preemption occurs when Congress explicitly declares an intent to preempt state law in a particular area.[14] Congress did not include any explicit statements regarding preemption of state law in the text of the Food Stamp Act, none are present in the text of the federal regulations, and the Agency does not argue that this is a case of express preemption.
Field preemption is the term used when the federal law governing a particular area is so comprehensive and so complete that Congress is said to have completely occupied a field, leaving no room for state law.[15] We "will not infer an intent to occupy the field where Congress has left some room for state involvement."[16] The Food Stamp Act and related regulations delegate broad authority to participating states in administering the food stamp program,[17] including authority with regard to overpayment collection.[18] The food stamp program is thus a cooperative federal  state venture, which anticipates significant involvement of both the state and the federal governments.[19] Accordingly, field preemption is not applicable here.[20] There is a role for state law in the *1162 administration of the food stamp program, as long as it does not conflict with federal law.
Conflict preemption occurs when a state law and a federal law are in conflict, either because compliance with both state and federal law is impossible or because the state law "stands as an obstacle to accomplishment and execution of the full purposes and objectives of Congress."[21] The Agency argues that equitable estoppel is preempted in this context because its application would create a conflict with federal law. Because the federal food stamp statutes and regulations intend that food stamp overpayments caused by state agency error be recouped from innocent food stamp recipient households, we agree.

1. The federal food stamp statutes and regulations intend that food stamp overpayments due to state agency error be recouped from innocent recipient households.
The Food Stamp Act states that "[e]ach adult member of a household shall be jointly and severally liable for the value of any overissuance of coupons."[22] In addition to declaring that households are liable for overpayments, the Food Stamp Act specifically requires state agencies to recoup overpayments from households, stating that "a State agency shall collect any overissuance of coupons issued to a household" by one of several listed recoupment methods, such as reduction of a household's future monthly allotment, or by "any other means."[23] It further states that "[a] State agency shall collect an overissuance of coupons issued to a household ... in accordance with the requirements established by the State agency for providing notice, electing a means of payment, and establishing a time schedule for payment."[24] The only exception to the Food Stamp Act's recoupment mandate applies where a state agency can demonstrate that recoupment would not be "cost effective."[25]
The Food Stamp Act recognizes that sometimes overpayments are made to innocent households but nonetheless provides for recoupment in such situations, imposing a cap of ten dollars or ten percent, whichever is greater, on monthly household allotment reduction for recoupment of overpayments not involving recipient fraud.[26] The existence of this cap for recoupment from innocent households demonstrates that Congress has recognized that recoupment may cause hardship to recipients. Congress has apparently determined that a cap on monthly allotment reduction of ten dollars or ten percent, whichever is greater, is sufficient to minimize the potential hardship to blameless food stamp recipients.
Before the passage of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), involuntary reduction of a household's future monthly food stamp allotment was not an option for recoupment of overpayments caused by agency error.[27] As one court has recognized, the amendments to the statute allowing involuntary allotment reduction as a collection strategy have increased the likelihood of success in recouping overpayments caused by agency error.[28] While households were technically *1163 liable for such overpayments prior to PRWORA, recoupment was rarely possible because households were judgment-proof and allotment reduction was prohibited.[29] When it enacted PRWORA, Congress provided state agencies with a more effective method for collecting food stamp overpayments caused by agency error.[30] By making it much easier for state agencies to recoup overpayments from even totally innocent households, Congress reinforced its intent that state agencies be able to recoup such overpayments.
The federal regulations implementing the Food Stamp Act also make clear that recoupment of overpayments to innocent households is required. The regulations state that an overpayment claim against a recipient household is "a Federal debt subject to this and other regulations governing Federal debts," that "[t]he State agency must establish and collect any claim by following the[ ] regulations,"[31] and that a state agency "must develop a plan for establishing and collecting claims that provides orderly claims processing and results in claims collections similar to recent national rates of collection."[32] The regulations reiterate the Food Stamp Act's assertion that "[e]ach person who was an adult member of the household" when the overpayment occurred is responsible for repaying it.[33] They also recognize, however, the Food Stamp Act's limited exception under which recoupment is not required where it would not be cost effective.[34]
The federal regulations recognize and address three different types of food stamp overpayment: "Intentional Program violation (IPV)," "Inadvertent household error (IHE)," and "Agency error (AE)."[35] The regulations treat each type of overpayment slightly differently,[36] but nonetheless provide for all three types of overpayment to be recouped from households. The regulations incorporate PRWORA's determination that involuntary monthly allotment reduction, capped at ten dollars or ten percent, is a permissible recoupment method for overpayments caused by agency error.[37] In fact, the regulations make allotment reduction the preferred method of recoupment for all overpayments, stating that a state agency "must" use allotment reduction unless "the claim is being collected at regular intervals at a higher amount or another household is already having its allotment reduced for the same claim."[38]
Thus, the federal statutes and regulations implementing the food stamp program intend for state agencies to recoup food stamp overpayments from recipient households, whether the overpayments were caused by recipient fraud or entirely by agency error. While federal law grants state agencies some limited flexibility with regard to how this is accomplished, the application of a state law or procedure that would completely bar recoupment of a large class of overpayments would clearly pose an obstacle to this federal mandate.

2. Applying equitable estoppel to prohibit the recoupment of food stamp overpayments due to agency error would create an inescapable conflict with federal law.
As described above, federal food stamp law requires state agencies to recoup food stamp overpayments from recipient households, regulates the manner in which they must do so, and makes allowances for the fact that some overpayments will be recouped from totally innocent households.
*1164 Alaska's doctrine of equitable estoppel, if applied, would completely bar recoupment in many, if not most, cases of overpayment caused by agency error. Equitable estoppel applies against the government in favor of a private party if four elements are present in a case: (1) the governmental body asserts a position by conduct or words; (2) the private party acts in reasonable reliance thereon; (3) the private party suffers resulting prejudice; and (4) the estoppel serves the interest of justice so as to limit public injury.[39] Most food stamp recipients receive and spend their food stamps in reasonable reliance on the eligibility determinations of the Agency. While we cannot presume that each of the elements of equitable estoppel would necessarily be present in every case in which a food stamp overpayment is caused by agency error, it is safe to say that they would be satisfied in many of these cases.
Application of equitable estoppel would thus bar recoupment of many overpayments that federal law intends for state agencies to recoup. As evidenced by the structure of the food stamp statutes and regulations described above, one congressional objective with regard to the Food Stamp Act and PRWORA is that food stamp overpayments, even those due entirely to agency error, will be efficiently recouped from recipients. The application of equitable estoppel would pose an obstacle to the accomplishment of this objective. Accordingly, Alaska's doctrine of equitable estoppel is in conflict with federal food stamp law, and is therefore preempted.
Allen and Wallis urge that this conflict can be avoided. They point to the catch-all provision wherein the Food Stamp Act, after listing several recoupment options such as allotment reduction, notes that state agencies may also recoup food stamp overpayments by "any other means."[40] Allen and Wallis insist that "any other means" encompasses the possibility that a state agency itself could repay the federal government for overpayments caused by agency error, rather than recouping such overpayments from recipient households. To decide that a state agency could obey the mandate that it "collect any overissuance of coupons issued to a household"[41] by "collecting" money from itself would require an improbable stretch of the statutory language. Though we are mindful that we must avoid manufacturing a conflict between federal and state law where none clearly exists,[42] the presumption against preemption does not require us to warp Congress's words to create harmony between federal and state law where they clearly conflict.
We are sympathetic to the argument that it is unfair to require indigent food stamp recipients to repay benefits that were overissued to them through no fault of their own, but Congress has already made the policy decision that a ten dollar or ten percent cap on monthly allotment reduction,[43] coupled with allowing state agencies some flexibility to compromise claims,[44] is sufficient to mitigate this unfairness. Alaska's doctrine of equitable estoppel cannot be used to effectively override this policy decision.

3. Our holding is consistent with the position of the Federal Food and Nutrition Service.
In the 1998 preamble to proposed changes to the federal food stamp regulations that *1165 were intended to incorporate statutory changes made by PRWORA,[45] the Food and Nutrition Service (FNS) responded to comments, stating that households are responsible for all overpayments with no exception for equitable estoppel.[46] In the 2000 preamble to the final rule implementing PRWORA's statutory changes, FNS again responded to comments, reiterating its position that equitable estoppel cannot bar recoupment.[47]
The Allen superior court erroneously referred to two of these FNS statements as "[a] 1996 amendment to the [Food Stamp] [A]ct" and "[a] 2000 amendment to the regulations governing the Food Stamp Act," and thereby found that the Agency had "properly relied on the language of the Food Stamp Act and the federal regulations in making its decision" to reject the equitable estoppel defense. The Allen superior court thus mistakenly accorded more weight to the FNS statements than they are due.
Because the FNS has not chosen to encode its position regarding equitable estoppel in a binding regulation,[48] this court need only defer to that position to the extent that it is persuasive (so-called "Skidmore deference").[49] In reaching our decision we rely primarily on our own assessment of the law as discussed above, but we note that our holding is consistent with the position of the FNS, which we believe to be correct.

4. Our holding avoids conflict with the federal principle that equitable estoppel cannot be applied against the government where it results in the payment of benefits not authorized by Congress.
In Office of Personnel Management v. Richmond, the United States Supreme Court held, based on the Appropriations Clause,[50] that where payments out of the public treasury are involved, equitable estoppel cannot be applied to require the federal government to pay benefits not otherwise authorized by law.[51] While the instant case differs from Richmond in that it involves a cooperative federal  state program in which the state agency is given substantial authority and flexibility, the federal government does provide the funding behind food stamp benefits. Just as estopping the Agency from recouping food stamp overpayments from innocent households would create a conflict with federal *1166 food stamp law as described above, it could also create a conflict with federal law regarding equitable estoppel and the use of public funds. Our holding avoids this potential conflict.

B. The Agency's Notice to Carla Allen Was Inadequate.
The Allen superior court concluded that the Agency's notice to Allen informing her of its recoupment action was sufficiently compliant with the requirements of the federal regulations and due process, and Allen appeals that determination. This issue arises in the Allen appeal and not the Wallis appeal because the Wallis superior court found that the Agency's notice to Wallis was insufficient, and the Agency has not appealed that decision. We conclude that the Agency's notice to Allen did not adequately comply with 7 C.F.R. § 273.18(e)(3)(iv).
Under 7 C.F.R. § 273.18(e)(3) a state agency seeking to collect an overpayment claim against a food stamp recipient must first give written notification to the affected household.[52] Subsection (iv) of the regulation lists fifteen pieces of information that every such notice must provide,[53] and Allen argues that the Agency's notice to her fails to provide three of them: "(E) How the claim was calculated," "(H) The opportunity to inspect and copy records related to the claim," and "(M) That the State agency may reduce any part of the claim if the agency believes that the household is not able to repay the claim." Allen argues that in failing to provide these pieces of information, the Agency's notice violated both the federal regulations and her right to due process. The Agency argues that its notice was adequate, and that even if it were inadequate, it would not matter because Allen did in fact receive notice and assert her rights.
Where the regulations are unclear as to precisely what information a notice must contain, due process requirements may be used to fill in the gaps.[54] Food stamps, like various other forms of government benefits, are property interests protected *1167 by due process.[55] Due process requires that benefit recipients be given "timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend" before their benefits are reduced or terminated, in order to afford them protection from "agency error and arbitrariness."[56] The Mathews v. Eldridge[57] due process balancing test instructs courts to consider what burden can reasonably be placed on an agency to eliminate the risk of erroneously depriving an individual of a benefit in light of the value of that benefit to the individual.[58] Where the recipient has a "brutal need" for the benefit at issue, as is the case with food stamps, "courts have traditionally required that agencies go to greater lengths  incurring higher costs and accepting inconveniences  to reduce the risk of error."[59] Further, "[i]n the context of notice, such effort might amount to erring on the side of providing too much detail respecting the basis for the agency's decision rather than too little."[60]

1. The Agency's notice did not comply with the requirement that it "include language stating ... (E) How the claim was calculated."
The Agency's notice to Allen contained some information about how the $304 overpayment claim against her was calculated. A chart at the bottom of the notice showed, for each of the two months of overpayment, (1) the amount Allen actually received, (2) the amount she had been entitled to, and (3) the overpayment amount for that month, which was the difference between the first two figures. If added together, the overpayment amounts for the two months totaled $304, the overpayment figure provided at the beginning of the notice. The Agency argues that this information was sufficient to inform Allen of "how the claim was calculated," as required by 7 C.F.R. § 273.18(e)(3)(iv)(E). Allen argues that the notice should have included information showing how the amount of her basic food stamp entitlement (i.e., the $119 figure) was calculated, not simply how that amount differed from the amount she received. Without that additional information, Allen argues, she would have no way of determining whether the calculations were accurate.
Allen relies on several cases, and though none addresses food stamp recoupment notices specifically, each holds a notice of benefit denial, termination, or reduction inadequate because due process required a more detailed explanation of agency calculations.[61] Due-process-compliant notices are designed to protect recipients from erroneous deprivation of benefits by allowing them to assess whether or not the agency's calculations are accurate.[62] As evidenced by this *1168 case, agencies make mistakes. If a major purpose served by benefit change or denial notices is protecting recipients from agency mistakes, then it stands to reason that such notices should provide sufficient information to allow recipients to detect and challenge mistakes. While the calculations shown in the Agency's notice to Allen would allow her to detect a simple mistake such as the top-level arithmetic error in calculating the amount of overpayment that was made in the notice to Wallis,[63] they would not allow her to detect the type of mistake that caused her overpayment problem in the first place, that is, an error in determining the amount of her true entitlement. Food stamp recipients should be given detailed information throughout their involvement with the food stamp program so that they can help prevent errors from occurring in the first place. But detailed information must be supplied at the post-error stage when the agency is attempting to recoup an overpayment; otherwise, the affected recipient is being told to accept an allotment reduction in blind reliance on the calculations of an agency that has admittedly already made a calculation error to that recipient's detriment. It would be unfair for the Agency to hold Allen liable for the Agency's own calculation errors, without in turn supplying her with enough information to enable her to double-check its calculations.
The risk of erroneous deprivation of benefits is substantial, the importance of those benefits to Allen is clear, and the Agency does not argue here, as agencies have argued in other similar cases, that providing more detailed information regarding its calculations would be such an unreasonable administrative burden that the Mathews due process balancing test would favor not requiring it. Courts in similar cases have found that the administrative burden involved in providing more detailed calculations was not unreasonable as compared to the risk of erroneous deprivation of much needed benefits.[64] Accordingly, we hold that the Agency's notice did not comply with 7 C.F.R. § 273.18(e)(3)(iv)(E).

2. The Agency's notice did not comply with the requirement that it "include language stating ... (H) The opportunity to inspect and copy records related to the claim."
The Agency's notice stated "If you... disagree with this action and want to review our records of the claim, please contact [your caseworker]." The Agency asserts that this language is sufficient to provide an "opportunity to inspect and copy records related to the claim" so as to satisfy 7 C.F.R. § 273.18(e)(3)(iv)(H), while Allen argues that it was insufficient because it did not inform Allen that she had the right to copy documents.
The language of 7 C.F.R. § 273.18(e)(3)(iv)(H) is quite clear in requiring that a recoupment notice "must" state that the recipient will have the "opportunity to inspect and copy records related to the claim" (emphasis added). The Agency's notice did not mention the right to copy records. Therefore, the Agency's notice did not comply with the regulation. The administrative hearing officer in Wallis found that "[t]he ability to copy is implicit in the right to review," but this is simply incorrect. And *1169 specific awareness of a right to copy records may make a difference to a food stamp recipient who is trying to assess whether it is worth it to appeal a potentially mistaken recoupment action. For instance, having that awareness, he could choose to make copies of the records and then consult with somebody who could help him review them.

3. The Agency's notice may have complied with the requirement that it "include language stating... (M) That the State agency may reduce any part of the claim if the agency believes that the household is not able to repay the claim."
The Agency's notice to Allen contained the language "[t]he agency can adjust the claim if full payment is not possible." The Agency asserts that this language was sufficient to inform Allen "[t]hat the State agency may reduce any part of the claim if the agency believes that the household is not able to repay the claim," as required by 7 C.F.R. § 273.18(e)(3)(iv)(M). This notice requirement was added to the regulations in 2000 in response to the 1997 Bliek v. Palmer decision, in which the Eighth Circuit held that a food stamp recoupment notice violated due process because it did not inform the recipient of the agency's ability to compromise claims.[65] Because the language used by the Agency conveys the basic information required by the regulation, we cannot say that the language used by the Agency is insufficient to satisfy 7 C.F.R. § 273.18(e)(3)(iv)(M). But, as the Wallis court noted, "the Agency would be on safer ground if it wanted to avoid future arguments like the one that was made in this case and in other cases" if it simply used notices containing the specific language provided in the regulations, thus avoiding needless semantic debate over whether the words "adjust" and "reduce" convey the same information.

4. The notice defects were not cured.
The Agency argues that Allen was not deprived of due process because she "availed herself of the right to challenge the [Agency's] demand," making any notice deficiencies irrelevant. The Agency also asserts that language in two later notices it sent to Allen after she requested an administrative hearing apprised her of her right to copy documents, thereby curing that potential defect in the original notice.
Though Allen is certainly aware at this point of the fact that she may inspect and copy Agency records and of the fact that the Agency may reduce the claim against her, the Agency has not shown that Allen has received actual notice of "[h]ow the claim [against her] was calculated."[66] More importantly, giving notice that complies with the regulations is a prerequisite to bringing a recoupment action.[67] The Agency provides no authority for its assertion that failure to comply with an explicit federal regulation notice requirement can be cured if a recipient, through her own initiative, challenges an Agency action and eventually obtains the information that the federal regulation specifically requires the Agency's initial notice to contain.[68]
Accordingly, if the Agency wishes to pursue its recoupment claims against Allen and Wallis, it must issue them notices that comply with the federal regulation requirements. The Agency should then consider exercising its discretion to compromise its claims against Allen and Wallis if reduction of their *1170 monthly food stamp allotments would pose a hardship to them.[69]

V. CONCLUSION
For the foregoing reasons, we AFFIRM the superior court decisions to uphold the administrative determination that Alaska's equitable estoppel doctrine is not an available defense to recoupment of food stamp overpayments. We REVERSE the superior court's decision to uphold the administrative determination that the Agency's notice to Carla Allen complied with federal regulation requirements.
NOTES
[1] 7 U.S.C. § 2011 et seq. (2006); 7 C.F.R. § 271.1 et seq. (2008). On October 1, 2008, the Food Stamp Act was renamed the "Food and Nutrition Act of 2008," the food stamp program was renamed the "supplemental nutrition assistance program," and instances of the word "coupons" were replaced with the word "benefits" in the statutes. Pub.L. No. 110-234, 122 Stat 923, 1092 (May 22, 2008). This opinion uses the pre-2008 names and terminology.
[2] The chart on the notice received by Wallis contained a small subtraction error for the month of September 2004, recording the amount of overpayment as $89 rather than $72, meaning that his total overpayment should have been $431 rather than $448.
[3] 63 Fed.Reg. 29304, 29307 (May 28, 1998); 65 Fed.Reg. 41752, 41765 (July 6, 2000).
[4] 63 Fed.Reg. at 29307.
[5] Cook Inlet Pipe Line Co. v. Alaska Pub. Utils. Comm'n, 836 P.2d 343, 348 (Alaska 1992).
[6] See Lopez v. Adm'r, Pub. Employees' Ret. Sys., 20 P.3d 568, 570 (Alaska 2001); see also State, Pub. Employees' Ret. Bd. v. Morton, 123 P.3d 986, 988 (Alaska 2005).
[7] Cook Inlet, 836 P.2d at 348 (citing Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).
[8] See State v. Arnariak, 941 P.2d 154, 158 (Alaska 1997) (recognizing "presumption against finding federal preemption in areas traditionally regulated by the states"); see also New York State Dep't of Soc. Servs. v. Dublino, 413 U.S. 405, 413, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973) ("It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so. The exercise of federal supremacy is not lightly to be presumed." (internal citation omitted)); Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963) (stating that, with respect to commerce, preemption is not appropriate "in the absence of persuasive reasons  either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained").
[9] Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 130, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) (quoting Huron Cement Co. v. Detroit, 362 U.S. 440, 446, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960)).
[10] Dublino, 413 U.S. at 421, 93 S.Ct. 2507.
[11] U.S. Const. art. VI, cl. 2.
[12] See State v. Dupier, 118 P.3d 1039, 1049 (Alaska 2005) ("Under the Supremacy Clause of the federal constitution, state laws that interfere with federal laws are invalid.").
[13] See id.
[14] For example, 29 U.S.C. § 1144 (2006), the ERISA statute, states in its first section that "the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title."
[15] For example, the Home Owners' Loan Act (12 U.S.C. § 1461 (2006)) gave the Federal Home Loan Bank Board such broad regulatory authority as to wholly preempt any state regulation over federal savings and loan associations. See Conference of Federal Sav. & Loan Assocs. v. Stein, 604 F.2d 1256, 1260 (9th Cir.1979), aff'd, 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980) ("In our judgment the regulatory control of the Bank Board over federal savings and loan associations is so pervasive as to leave no room for state regulatory control.").
[16] Dupier, 118 P.3d at 1050.
[17] See, e.g., 7 U.S.C. § 2020 (2006); 7 C.F.R. § 271.4 (2008).
[18] See 7 C.F.R. § 271.4(b) (2008) ("FNS delegates to the State agency, subject to the standards in § 273.18, the authority to determine the amount of, and settle, adjust, compromise or deny all or part of any claim which results from fraudulent or nonfraudulent overissuances to participating households.").
[19] See, e.g., 7 U.S.C. § 2020 et seq.; 7 C.F.R. § 271.4; see also Reynolds v. Giuliani, 506 F.3d 183, 187 (2d Cir.2007) ("The Food Stamp Act, 7 U.S.C. § 2011 (2006) et seq., and the Medicaid Act, 42 U.S.C. § 1396 (2006) et seq., created cooperative federal  state programs aiming, respectively, to raise nutritional levels and furnish medical care to needy individuals.").
[20] See Pharm. Research & Mfrs. of Am. v. Meadows, 304 F.3d 1197, 1206 (11th Cir.2002) ("[The] federal government cannot `occupy the field' [of Medicaid] when no Medicaid relief is available unless a state designs and implements its own Medicaid program.").
[21] Roberts v. State, Dep't of Revenue, 162 P.3d 1214, 1223 (Alaska 2007) (internal citation omitted); see also Catalina Yachts v. Pierce, 105 P.3d 125, 128-29 (Alaska 2005).
[22] 7 U.S.C. § 2022(a)(4).
[23] 7 U.S.C. § 2022(b)(1) (emphasis added).
[24] 7 U.S.C. § 2022(b)(4) (emphasis added).
[25] 7 U.S.C. § 2022(b)(2).
[26] 7 U.S.C. § 2022(b)(3) (distinguishing between overpayments involving recipient fraud and those made to innocent households by providing a cap on possible allotment reduction for overpayments not involving recipient fraud).
[27] Pub.L. No. 104-193 § 844, 110 Stat. 2105, 2332 (Aug. 22, 1996).
[28] See Stone v. Hamilton, 308 F.3d 751, 756 (7th Cir.2002) ("[P]rior to the amendments, for all intents and purposes, there were no legal consequences to the overissuance because the indigent recipients were judgment proof or had no state tax refunds to intercept.... Since the enactment, collection is almost guaranteed.... By changing the remedies for collecting for overpayments from ineffective and discretionary to highly effective and mandatory, the amendment has increased the recipients' liability....").
[29] See 7 U.S.C. § 2022(b)(2) (1995); Stone, 308 F.3d at 752-53.
[30] See Stone, 308 F.3d at 753 ("Suddenly the states were not only required to collect for their errors, but they also had an effective means of doing so.").
[31] 7 C.F.R. § 273.18(a)(2) (2008) (emphasis added).
[32] 7 C.F.R. § 273.18(a)(3).
[33] 7 C.F.R. § 273.18(a)(4)(i).
[34] 7 C.F.R. § 273.18(e)(2), (e)(8)(ii)(D).
[35] 7 C.F.R. § 273.18(b).
[36] See, e.g., 7 C.F.R. § 273.18(c)(1)(ii)(B), (g)(1)(ii)-(iii), (k)(1).
[37] 7 C.F.R. § 273.18(f)(1), (g)(1).
[38] 7 C.F.R. § 273.18(g)(1)(i).
[39] Crum v. Stalnaker, 936 P.2d 1254, 1256 (Alaska 1997); Municipality of Anchorage v. Schneider, 685 P.2d 94, 97 (Alaska 1984); see also Nelson v. State of Alaska, Commercial Fisheries Entry Comm'n, 186 P.3d 582, 585 (2008).
[40] 7 U.S.C. § 2022(b)(1) (2006) states:

[A] State agency shall collect any overissuance of coupons issued to a household by 
(A) reducing the allotment of the household;
(B) withholding amounts from unemployment compensation from a member of the household under subsection (c) of this section;
(C) recovering from Federal pay or a Federal income tax refund under subsection (d) of this section; or
(D) any other means.
[41] 7 U.S.C. § 2022(b)(1).
[42] See Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 130, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978).
[43] 7 U.S.C. § 2022(b)(3).
[44] See 7 U.S.C. § 2022(a)(1).
[45] Pub.L. No. 104-193 § 844, 110 Stat. 2105 (Aug. 22, 1996).
[46] 63 Fed.Reg. 29,307 (May 28, 1998) ("Some groups maintain that, since the reason for the overissuance resulting in the [Agency Error] claim was an error by the State agency, the household should not be responsible for the overissuance under laws in a number of States under the legal concept of equitable estoppel. The Department disagrees with this position.... Federal law permits no exception for equitable estoppel in the case of an overissuance caused by State agency error.").
[47] 65 Fed.Reg. 41,765 (July 6, 2000) ("Two recipient interest groups disagreed with our position on [Agency Error] claims and equitable estoppel. They believe that the [Food Stamp Act] does not specifically prohibit equitable estoppel, especially since this activity is delegated to State agencies. We disagree. Section 13(a)(2) of the [Food Stamp Act] clearly states that a household `... shall be ... liable for the value of any overissuance of coupons.' This language establishes that a household must be held accountable for any claim, including those caused by agency errors.... One State agency commented that we need to strengthen the fact that equitable estoppel does not apply to food stamp [Agency Error] claims. The commenter suggested that we add specific language to the regulations indicating this position. We do not believe that this is necessary. The discussion above and in the preamble of the proposed rule should suffice and no change is needed in the final rule.").
[48] See Christensen v. Harris County, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ("Interpretations such as those in opinion letters  like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law  do not warrant Chevron-style deference.").
[49] See Vigil v. Leavitt, 381 F.3d 826, 835 (9th Cir.2004) (stating that EPA interpretations contained in regulation preamble and addendum were "entitled to so-called Skidmore deference insofar as they `constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944))).
[50] U.S. Const. art. I, § 9, cl. 7.
[51] 496 U.S. 414, 427, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990).
[52] 7 C.F.R. § 273.18(e)(3) (2008) ("Each State agency must develop and mail or otherwise deliver to the household written notification to begin collection action on any claim.").
[53] 7 C.F.R. § 273.18(e)(3)(iv) provides:

The initial demand letter or notice of adverse action must include language stating:
(A) The amount of the claim.
(B) The intent to collect from all adults in the household when the overpayment occurred.
(C) The type (IPV [Intentional Program Violation], IHE [Inadvertent Household Error], AE [Agency Error] or similar language) and reason for the claim.
(D) The time period associated with the claim.
(E) How the claim was calculated.
(F) The phone number to call for more information about the claim.
(G) That, if the claim is not paid, it will be sent to other collection agencies, who will use various collection methods to collect the claim.
(H) The opportunity to inspect and copy records related to the claim.
(I) Unless the amount of the claim was established at a hearing, the opportunity for a fair hearing on the decision related to the claim. The household will have 90 days to request a fair hearing.
(J) That, if not paid, the claim will be referred to the Federal government for federal collection action.
(K) That the household can make a written agreement to repay the amount of the claim prior to it being referred for Federal collection action.
(L) That, if the claim becomes delinquent, the household may be subject to additional processing charges.
(M) That the State agency may reduce any part of the claim if the agency believes that the household is not able to repay the claim.
(N) A due date or time frame to either repay or make arrangements to repay the claim, unless the State agency is to impose allotment reduction.
(O) If allotment reduction is to be imposed, the percentage to be used and the effective date.
[54] See, e.g., Ortiz v. Eichler, 794 F.2d 889, 892-93 (3d Cir.1986) ("Although [the federal] regulations do not specify precisely the information required for adequate notice, the district court properly looked to requirements mandated by the due process clause to flesh out the details."); Schroeder v. Hegstrom, 590 F.Supp. 121, 127 (D.Or. 1984) ("In determining whether the notice at issue is adequate, I am guided by the language of the regulations. The language of the regulations is not sufficiently specific to be determinative, however. Therefore, as other courts have done, I construe the regulations as mandating compliance with the requirements of due process.").
[55] Atkins v. Parker, 472 U.S. 115, 128, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985).
[56] Baker v. State, Dep't of Health & Soc. Servs., 191 P.3d 1005, 1009 (Alaska 2008) (quoting Goldberg v. Kelly, 397 U.S. 254, 267, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)).
[57] 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).
[58] Baker, 191 P.3d at 1010 (citing Mathews, 424 U.S. at 334-35, 96 S.Ct. 893).
[59] Id.
[60] Id. at 1010-11.
[61] See Ortiz v. Eichler, 794 F.2d 889, 895 (3d Cir.1986) (affirming lower court order that notices of benefit denial, termination, and reduction must contain detailed calculation information in class action by food stamp, Medicaid, and AFDC applicants and recipients); Dilda v. Quern, 612 F.2d 1055, 1056-57 (7th Cir.1980) (holding that benefit reduction and termination notices to AFDC recipient class after "rebudgeting" violated due process because they did not reveal what deductions were relied upon in calculating adjusted net amount of recipients' income); Banks v. Trainor, 525 F.2d 837, 842 (7th Cir.1975) (affirming preliminary injunction requiring notice with "breakdown of income and deductions so that recipients could determine accuracy of new computations" before class members' food stamps could be reduced after mass change in benefit calculation method); Ford v. Shalala, 87 F.Supp.2d. 163, 186 (E.D.N.Y.1999) (holding that SSI benefit notices violated due process because they did not provide enough calculation information to allow recipients to determine whether their benefit amounts were correct).
[62] See Ortiz, 794 F.2d at 893 ("[Proper] notice is necessary to protect claimants against proposed agency action `resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases.'" (quoting Goldberg v. Kelly, 397 U.S. 254, 268, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970))); Dilda, 612 F.2d at 1057 ("[W]ithout these calculations, plaintiffs have little protection against errors committed by the Department in determining the amount of their grants."); Banks, 525 F.2d at 842 ("Both Goldberg and Vargas require detailed notice of adverse action as a protection against agency error and arbitrariness."); Vargas v. Trainor, 508 F.2d 485, 490 (7th Cir.1974) ("Unless the welfare recipients are told why their benefits are being reduced or terminated, many of the mistakes that will inevitably be made will stand uncorrected...."); Ford, 87 F.Supp.2d. at 178 ("Without this information, claimants cannot check the factual much less the mathematical accuracy of [the Department's] intended action.").
[63] See supra note 2.
[64] See, e.g., Dilda, 612 F.2d at 1057 ("[T]he risk of erroneous calculations by the Department far outweighs the increased burden on the administration.... Due Process can be satisfied by simply photocopying the work papers and enclosing them with the notice...."); Ford, 87 F.Supp.2d. at 182-85 (finding that requiring more detailed notice was in the public interest despite the administrative burden of developing a new computer program to produce budget worksheets to include in notices to SSI recipients).
[65] See 65 Fed.Reg. 41761 (July 6, 2000); Bliek v. Palmer, 102 F.3d 1472, 1476 (8th Cir.1997).
[66] 7 C.F.R. § 273.18(e)(3)(iv)(E) (2008).
[67] 7 C.F.R. § 273.18(e)(3)(i).
[68] See Vargas v. Trainor, 508 F.2d 485, 489-90 (7th Cir.1974) (holding that benefit reduction and termination notices that did not provide reasons for the agency's action violated due process despite fact that recipients could call caseworkers to learn the reasons and stating that "[u]nder such a procedure only the aggressive receive their due process right to be advised of the reasons for the proposed action"); Ortiz v. Eichler, 616 F.Supp. 1046, 1062 (D.Del. 1985) ("Defendants cite no authority for the ... argument... that plaintiffs must show that they were actually harmed by inadequate notice  and the Court finds it to be without merit."), aff'd, 794 F.2d 889 (3d Cir.1986).
[69] As the Agency's counsel stated at oral argument, the Agency's recoupment notices "provide [recipients] the opportunity to give a call to their caseworker and say `you know what, I just can't do that, there's no way that I can feed my family if you're going to take that money, reduce my allotment, and so let's work on it.' That's where the compromise authority that was granted to the state division from the Secretary of Agriculture comes into play."